234

Theodore L. McCAUGHERTY, et
al., Plaintiffs,

v.

Thomas C. SIFFERMANN, Defendants.

No. C–88–2747 EFL (WDB).

United States District Court,
N.D. California.

Aug. 10, 1990.

tion Fund, which was successor in interest to the FSLIC as receiver for Farmers Savings, and the Resolution Trust Corporation, as receiver for the Federal Asset Disposition Association (FADA), have joined in opposition to plaintiffs' motion to compel production of some 700 documents.

In Part I of this opinion and order we present an overview of the parties, their relationships, and the dispute that underlies plaintiffs' motion. In Part II we address issues raised by the defendants' assertions of attorney-client privilege. To do so coherently, we have grouped the communications in issue into categories; we consider separately the privilege issues for each category of documents. In Part III we consider whether defendants have made a showing sufficient to support a conclusion that those documents not protectable from disclosure by the attorney-client privilege are nonetheless protected by the work product doctrine.

Kim Stephens and Stephan Fjelstad of Tousley Brain, Seattle, Wash. and John Stewart and David Marks of Carroll, Burdick and McDonough, San Francisco, Cal., for plaintiffs.

Robert Kaplan and Joseph Demko of Frandzel & Share, San Francisco, Cal., for defendants and counterclaimants Federal Deposit Ins. Corp.

## OPINION AND ORDER RE PRIVILEGE ISSUES

WAYNE D. BRAZIL, United States Magistrate.

*Introduction*

Invoking the attorney-client privilege and the work product doctrine, defendants FDIC, as manager for the FSLIC Resolu-

I

## FACTUAL BACKGROUND

A. *The Players*

In October of 1985, the Federal Home Loan Bank Board placed Farmers Savings Bank (Old Farmers) into a liquidating receivership. FSLIC then assigned most of the assets and liabilities of Old Farmers to New Farmers. One of the assets transferred from Old Farmers was the stock in FSB, Inc.; on October 11, 1985, FSB became a wholly-owned subsidiary of New Farmers. The same people served as the directors of Farmers and of FSB (for that reason, in some places herein we refer to the two entities as "Farmers/FSB"). Claims of Old Farmers against its former officers and directors were assigned to FSLIC in its corporate capacity (hereafter, FSLIC).

On October 11, 1985, the FSLIC also placed New Farmers into the Management Consignment Program (MCP). The purpose of the MCP was to place a troubled savings and loan (e.g., Old Farmers) in a holding pattern in order to give the FSLIC

an opportunity to analyze the savings and loan and determine its ultimate disposition. (Mitchell Decl.)

The rules in effect in the MCP required Farmers Savings to provide substantial amounts of information on a routine basis to the FSLIC (so that its financial condition could be monitored) and to obtain approval from the FSLIC for any major decisions which significantly affected Farmers' financial condition. For example, FSLIC had to approve decisions about the sale of Farmers' subsidiaries and the retention of a company to market FSB. (Mitchell Decl.)

Defendant FADA was a wholly-owned subsidiary of FSLIC that was created in 1986 for two purposes. It provided asset management services on behalf of receiverships and it served a consulting and advisory role for savings and loan associations that were in the MCP. FSB retained FADA to provide management services to FSB and to assist in efforts to market FSB for sale. In conjunction with these tasks, FADA hired various consultants, including Thomas Siffermann, and K. Peter Zech, who helped arrange for the sale of FSB. (Siffermann Decl., Zech Decl.)

The law firm of Downey, Brand & Seymour ("Downey, Brand") served as counsel to both Farmers and FSB on a wide range of matters, including the efforts to sell FSB. (Blake Decl.)

The law firm of Pettit & Martin, principally in the person of James Topinka, served as counsel to both the FSLIC and FADA. (Topinka Decl.) Pettit & Martin provided legal services on several different matters arising out of the Farmers receivership, including the effort to sell FSB. Pettit & Martin also represented FSLIC as plaintiff in an officers and directors action filed in March of 1987 against former officers of Old Farmers and its subsidiaries ("*FSLIC v. Anders*"). FSLIC named as one of the defendants in that action Theodore McCaugherty, one of the plaintiffs in the case at bar.

### B. *The Transaction*

In this action plaintiffs, buyers of FSB, allege, among other things, that they were defrauded by Mr. Sifferman and others in the negotiations leading to the FSB sale. (Plaintiffs' Third Amended Complaint) Central to the resolution of the action is the Stock Purchase Agreement (SPA) describing and governing the sale terms. Rather than documenting a simple transaction between plaintiffs and New Farmers, the SPA is an intricate and sophisticated sales contract expressly conditioned upon FSLIC's approval. One term, for example, requires as a condition precedent that FSLIC, FADA and New Farmers release plaintiff McCaugherty and two others (Mr. Keller, an officer of FSB's subsidiary, SPI; and McCaugherty's business associate, S. Troner) from all claims and causes of action in connection with the officers and directors action. (Exhibit 56 of Demko Decl. filed June 6, 1990, pp. 5, 6) In exchange, a "material portion of the consideration paid to Farmers by the Purchaser ... was paid ... for the release and settlement of claims against McCaugherty and Keller", that is, claims being litigated in *FSLIC v. Anders*. (*Id.*, at 13). Additionally, the SPA required FSLIC to indemnify plaintiff McCaugherty if certain events occurred. Thus, the SPA was not simply a stock transaction agreement: rather, it included an attempt by plaintiffs to adjust many of their potential obligations and liabilities to defendants.

### C. *Alignment of the Parties' Interests*

At the request of the court, the parties have provided information about the interests of the various persons and entities who participated in the effort to sell FSB. Defendants have argued that those interests were, for all practical purposes, coterminous. Plaintiffs, by contrast, have pointed to potential tensions, including potential differences of opinion between FSLIC and the "members" of Farmers/FSB about appropriate terms for settling an action against officers and directors of Old Farmers and how to allocate the proceeds of the sale of FSB. If the disposition of the issues raised by plaintiffs' motion turned on our full endorsement of defendants' "sellers group" theory, we would feel con-

strained to analyze in detail the alignment of the interests of the various figures in the "sellers group." As subsequent sections of this opinion show, however, acceptance or rejection of the "sellers group" theory is not essential to resolution of any of the issues we confront here. For that reason, we decline to resolve the disputes between the parties about whether there were tensions between the interests of some of the members of the "sellers group."

## D. *The Disputed Documents*

Plaintiffs served their First Request for Production of Documents on defendants in June of 1989. Eventually, defendants responded by producing documents they did not consider privileged and by refusing to produce some 700 documents they contended were protected by the attorney-client privilege and/or the work product doctrine. For purposes of this opinion, we have divided the disputed documents into the following categories:

A. Communications between Pettit & Martin and FADA (that were shared with no one other than FSLIC and/or FADA's consultants);

B. Communications between Pettit & Martin and Mr. Siffermann and/or Mr. Zech (that were shared either with no one, or with no one other than FADA and FSLIC);

C. Communications that Pettit & Martin, FSLIC, FADA, Siffermann or Zech made to, shared with (by way of informational copy or otherwise), or received from personnel at Farmers and/or FSB;

D. Communications between Downey, Brand and their Clients, Farmers/FSB.

Defendants have done such a poor job of describing on their privilege log the documents that they have withheld that we cannot be confident that the four categories listed above cover all of the disputed documents. At the end of this opinion and order we impose several duties on defendants. One of these duties is either to affirm that no documents have been withheld that are not covered by the categories discussed here or, should there be any such documents, to provide, for each such document, all the information demanded in paragraph 2, sections 1 through 8 of the Standing Order that is attached hereto as Appendix A.

## II

## ATTORNEY–CLIENT PRIVILEGE

CATEGORY A: *Communications between Pettit & Martin and FADA (that were shared with no one other than FSLIC and/or FADA's consultants)*

■ Plaintiffs assert that the attorney-client privilege cannot attach to communications between Pettit & Martin and FADA because there was no attorney-client relationship between them. Defendants have submitted a presumptively competent declaration from Mr. Topinka, however, in which he states unequivocally that Pettit & Martin represented both the FSLIC and FADA. Plaintiffs offer no competent evidence that challenges or tends to contradict this assertion by Mr. Topinka. Moreover, the facts that FADA was a wholly owned subsidiary of the FSLIC's, and that it served as an agent for FSLIC interests, tend to support the claim that FADA was a "client" of Pettit & Martin's with respect to efforts to sell FSB. We find, therefore, that an attorney-client relationship existed between FADA and Pettit & Martin and that the privilege could attach to communications between them. Moreover, given the fully coterminous interests between FADA and FSLIC with respect to the sale in issue here, and the agency relationship between these two entities, there would be no waiver of the privilege solely by virtue of the fact that communications between FSLIC and Pettit & Martin were shared with FADA, or that communications between FADA and Pettit & Martin were shared with the FSLIC.

For reasons we explain in the next section, we also have concluded that there can be no finding of waiver or failure of privilege that otherwise would attach simply because a communication between Pettit & Martin, FSLIC, and/or FADA also was

shared with one or both of the consultants FADA retained to help sell FSB, Thomas Siffermann and K. Peter Zech.

■ On the other hand, we are not satisfied that defendants have adduced competent evidence that would show that all the communications in this category (i.e., communications between Pettit & Martin and FADA, some of which may have been shared with FSLIC, Siffermann, and/or Zech, or communications between FSLIC and Pettit & Martin that were shared with FADA, Siffermann and/or Zech) were made primarily for the purpose of generating legal advice. Given the fact that the ultimate goal of the relevant work by FSLIC and FADA was a *business* goal, i.e. to sell FSB, it is far from obvious that all communications on this subject to which Pettit & Martin was privy, either actively or by its receipt of a copy, were made primarily for the purpose of generating legal advice. In this setting (where there is a clear business purpose in the environment in which the communications occurred), the court should sustain an assertion of privilege only when there is a clear evidentiary predicate for concluding that *each* communication in question was made *primarily* for the purpose of generating legal advice. No privilege can attach to any communication as to which a business purpose would have served as a sufficient cause, i.e., any communication that would have been made because of a business purpose, even if there had been no perceived additional interest in securing legal advice. *Fisher et al. v. United States et al.*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1975). Similarly, privilege cannot attach to any communication that was compelled by a statute or regulation and whose confidentiality was not clearly preserved by the statutory or regulatory scheme. This follows because the privilege "applies only where necessary to achieve its purpose. Accordingly, it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Id.* at 403, 96 S.Ct. at 1577.

Because there is reason to suspect that some of the communications in the category under consideration here were made primarily for business purposes and/or would have been made even if no one had had any interest in legal advice, we must ORDER defendants to provide additional information about each communication in this category that defendants continue to insist is entitled to protection by the privilege. For each such communication, defendants must provide all the information called for in paragraph 2 ("Attorney–Client Privilege") of the Standing Order attached as Appendix A. Moreover, to satisfy section 4 of paragraph 2 of the Standing Order, defendants must submit competent evidence (by way of declaration or otherwise) that would support an inference that the communication was made primarily in order to generate legal advice and that neither business purposes nor regulatory requirements would have provided sufficient incentive to make the communication. These declarations must be by the author of the communication or by the person at whose direction the communication was made.

Since the Standing Order also requires defendants to identify all persons or entities to whom copies of the communications in question were sent, and since the court has concluded that an attorney-client relationship existed involving, simultaneously, FSLIC, FADA, and Pettit & Martin, defendants need not submit additional declarations to establish the confidentiality of documents in this category that were not copied to persons outside FSLIC, FADA, and Pettit & Martin.

CATEGORY B: *Communications between Pettit & Martin and Mr. Siffermann and/or Mr. Zech (that were shared either with no one, or with no one other than FADA and FSLIC)*

■ Pettit & Martin did not purport to directly "represent" Mr. Sifferman or Mr. Zech. Rather, Pettit & Martin represented FADA and FSLIC, the entities for whom, with respect to the effort to sell FSB, Siffermann and Zech served as consultants. One of the central issues raised by plaintiffs' motion is whether, under the princi-

ples announced in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), Siffermann and Zech should be treated as the functional equivalents of employees of FADA and/or FSLIC, so that privilege could attach to confidential communications from them to Pettit & Martin that were made for the purpose of enabling Pettit & Martin to offer fully informed legal advice to its clients (FADA and FSLIC), or from Pettit & Martin to Siffermann or Zech that were made to enable them to understand the legal and regulatory environment within which they were negotiating on behalf of FADA and FSLIC, or to conform to the law their negotiating behavior and their proposals for terms of the FSB sale.

According to defendants, Mr. Siffermann and Mr. Zech were hired as consultants by FADA for the express purpose of assisting with efforts to sell FSB. (*See, e.g.,* Exhibits 4 and 5 to Supp. Decl. of K. Stephens). In this role, their charge was to advance the interests of FADA and the FSLIC, by, among other things, looking for prospective buyers and suggesting and analyzing various terms on which such a sale might be made. They did this work in an environment dense in regulations. We can safely assume that they and their employers knew that whatever deals they considered had to be analyzed within that regulatory framework. They also knew that there would be consequential legal implications of the terms on which the sale was consummated. Given these circumstances, we infer that it would be necessary for both consultants to provide information to Pettit & Martin in order for that law firm to be in a position to provide its clients, FADA and the FSLIC, with fully informed legal advice with respect to the sale of FSB. Similarly, we infer that in order to be sure that their clients' agents for this purpose (Siffermann and Zech) understood the legal environment within which they were required to work, and the legal implications of any deals or terms they proposed, it would be necessary for Pettit & Martin to provide information and guidance to Siffermann and Zech. As in *Upjohn*, Siffermann and Zech acted within the scope of their employment (by aiding FADA in the efforts to sell FSB) and under the direction of their supervisor, FADA, when communicating with Pettit & Martin. (Siffermann, Zech Decls.) Thus, with respect to communications relating to the sale of FSB, we can find no principled basis for distinguishing consultants Siffermann and Zech from the kinds of employees to whom the Supreme Court extended the protection of the privilege in *Upjohn.*

Given our conclusion that the privilege can attach to communications involving Siffermann and/or Zech, we must reject any suggestion that the fact that communications otherwise privileged were shared with either or both of these consultants results, by itself, in a waiver. This conclusion underlies our holding (in the previous category) that communications between Pettit & Martin and FADA (and/or FSLIC) that were shared in confidence with either of these consultants may still be protectable by the privilege.

The declarations submitted by these gentlemen support a finding that they intended their communications with Pettit & Martin to be confidential and that they understood that the communications they received from that law firm were intended to be confidential. These declarations are *not* sufficient, however, to support a finding that people at Farmers or FSB who may have been privy to communications involving the consultants and Pettit & Martin shared these understandings about confidentiality. The *Upjohn* court permitted extension of the privilege over communications with non-control group employees where such communications were considered "highly confidential" when made *and* where the company took explicit steps to maintain such confidentiality. *Upjohn*, 449 U.S. at 395, 101 S.Ct. at 685. As we will discuss in detail in the next section ("CATEGORY C ..."), the fact that such steps were not taken in regard to communications between Pettit & Martin and one or both consultants fatally compromised their confidentiality and deprived them of protection by the privilege.

Similarly, the declarations submitted by Siffermann and Zech are insufficient to support a finding that all of the confidential communications between either or both

of them, on the one hand, and Pettit & Martin, on the other, were made primarily for the purpose of generating legal advice. Mr. Zech declares that "on occasion" he communicated with Pettit & Martin for the purpose of helping generate legal advice, but he does not declare that *all* of his communications with that law firm were for that purpose. Nor does he state explicitly that the *primary* purpose of any of his communications was to aid in generating legal advice. Mr. Siffermann's declaration ignores this issue altogether: while he says that his communications with Pettit & Martin were intended to be confidential, he says nothing about the primary purpose of any of those communications. Given this important shortfall in these declarations, and given the fact that the ultimate goal of the work performed by each of these consultants obviously was a *business* goal, i.e., the sale of FSB, the court hereby ORDERS defendants, by August 27, 1990, to complete their privilege log in compliance with the attached Standing Order (Appendix A) for all communications between Siffermann and/or Zech and Pettit & Martin, over which defendants can and do still assert the privilege (consistent with the principles stated in this opinion and with F.R.C.P. 11). Specifically, to satisfy section 4 of paragraph 2 of the Standing Order for each withheld communication in this category, defendants must submit competent evidence (in the form of a declaration signed by the communicator or the person at whose direction the communication was made) showing that it was made primarily for the purpose of generating legal advice. The court further ORDERS that defendants produce, by August 27, 1990, all communications in this section over which they cannot continue to claim the privilege in good faith.

CATEGORY C: *Communications that Pettit & Martin, FSLIC, FADA, Siffermann or Zech made to, shared with (by way of informational copy or otherwise), or received from personnel at Farmers and/or FSB*

■ In an earlier section we described the relationships between the several actors in the real world drama that underlies this litigation. As that description shows, with respect to the effort to sell FSB, the FSLIC, through the Management Consignment Program, and with the assistance of FADA, exercised ultimate control over both Farmers and FSB. Moreover, with respect to that sale, FSLIC, FADA, Farmers and FSB shared at least some important interests; all parties sought to maximize the consideration that would be generated by selling FSB. Under these circumstances, at least in the absence of a showing that there were significant potential tensions between the interests of these institutions with respect to some aspect of the sale transaction,[1] it is arguable that FSLIC was, in effect, "substituted in" for Farmers and FSB as the holder of the privilege with respect to communications on this subject matter (i.e., related to the sale of FSB) between Farmers and/or FSB, on the one hand, and, on the other, Pettit and Martin, counsel for FSLIC and FADA.

Given the power FSLIC exercised over Farmers/FSB, with respect to the sale in issue here, one might conclude that Farmers/FSB had no legally relevant independent existence with respect to communications with FSLIC's counsel that related to the effort to sell FSB. Under this model, because of the statutory authority over Farmers/FSB that the FSLIC exercised, and because of the responsibilities to the public that the FSLIC shouldered in this transaction, there is support, albeit not in cases that are on all fours with this one, for the view that decision-making power with respect to privileges moved from Farmers/FSB to FSLIC. *See, e.g., Odmark, et al. v. Westside Bankcorp.*, 636 F.Supp. 552 (W.D.Wash.1986) (finding that the FSLIC was the exclusive holder of the privilege between savings and loan association in bankruptcy and the S & L's law firm where statute invested FSLIC with total decision-making power over the entity), *and Cf., Commodity Futures Trading*

---

**1.** Plaintiffs argue that such tensions in fact existed in this case. For reasons made clear later in this section, we need not make a finding on this issue.

*Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (holding that a bankruptcy trustee, as the actor most closely analogous to that of a solvent corporation's management, controlled the corporation's privilege with respect to pre-bankruptcy communications).

If, for purposes of privilege doctrine with respect to communications on this subject, the legal egos of Farmers, FSB, and the FSLIC were merged, FSLIC might well have had the power to order Farmers/FSB to communicate confidentially with FSLIC's counsel, Pettit and Martin, and to require Farmers/FSB to maintain the confidentiality of communications received on this subject from Pettit & Martin (insofar as such communications were made primarily for the purpose of generating legal advice). This result could be considered consistent with the well-established requirement that the privilege may attach only to communications between a client and its lawyer because, in theory, the merger (for purposes of the sale of FSB) of the legal egos of FSLIC and Farmers/FSB in effect could make Pettit & Martin, as counsel to FSLIC and FADA, counsel for Farmers/FSB.

Courts decide cases based on real world conduct, however, not on theory. And the evidence about the real world in which the communications in issue here took place leaves defendants' theory fatally vulnerable. To convert its theoretical capacity to control the confidentiality of these communications into a real world (legally enforceable) entitlement, the FSLIC was required (at a minimum), by fundamental precepts of privilege doctrine, to take clear, affirmative steps to assure that Farmers/FSB understood, before communication occurred, that FSLIC was in fact replacing Farmers/FSB as holders of the privilege, that these two "controlled" institutions should consider FSLIC's counsel as their counsel for purposes of communications on this subject, and that all such communications had to be kept confidential. Defendants should have taken steps similar to those found sufficient by the Supreme Court in *Upjohn,* where employees from whom information was sought were clearly

informed that the information would be used to formulate legal views and advice and were instructed to treat the investigation as "highly confidential". *Upjohn,* 449 U.S. at 387, 395, 101 S.Ct. at 681, 685.

The obligation in FSLIC to take such affirmative steps is informed not only by well-established attorney-client privilege doctrine, but also by three important real world facts. The first (and probably least important) of these facts is that despite the considerable power FSLIC could wield over Farmers and FSB, these two entities remained separate corporations, and, after the creation of "New Farmers" and its placement in the MCP, Farmers and FSB retained considerable freedom of action with respect to transactions whose value was less than $1,000,000. (Maisel Depo.) After Farmers was reconstituted and moved into the MCP, the FSLIC did not exercise direct, day to day control over a substantial portion of this S & L's activity. That fact has two implications for present analytical purposes. One is that it puts some strain in the analogy between the situation here and a trustee in bankruptcy, though perhaps not to the breaking point with respect to the efforts to sell FSB (where more instruction remains in the analogy because of FSLIC's power to determine the terms and conditions of the sale). *Cf., Commodity Futures, supra,* 471 U.S. 343, 105 S.Ct. 1986; *Odmark, supra,* 636 F.Supp. at 553. More .important, the non-diminimus residual legal and functional independence of New Farmers (and, derivatively, of FSB) as corporations would make it somewhat less likely that their officers and directors would understand, without being specifically told, that they had no identity and no powers separate from the FSLIC's with respect to communications with counsel. More concretely, the independence of Farmers in areas outside the sale of FSB decreased the likelihood that its directors and officers simply would assume that FSLIC's counsel also was serving as counsel to Farmers, and that they should take care to preserve the confidentiality of communications with FSLIC's counsel in order to safeguard the

attorney-client privilege. Farmers' partial independence made it less likely that Farmers/FSB would perceive Pettit & Martin as their counsel, and less likely that they would perceive the FSLIC as the sole repository of power with respect to their communications with lawyers. Consequently, we cannot *assume* that they would perceive that communications with Pettit & Martin were expected to be confidential, even communications related to the effort to sell FSB.

The second real world fact that undermines defendants' capacity to convert their theoretical argument into an enforceable right is that Farmers and FSB *had their own lawyer*, D. Steven Blake of Downey, Brand, *who provided legal advice and services to Farmers and FSB with respect to the sale of FSB*. (Blake Decl.) The fact that these separate corporate entities had their own lawyer with respect to the transaction in issue makes it appreciably less likely that their directors and officers would perceive Pettit and Martin as being counsel to Farmers/FSB, or would have any reasonable basis to expect that their communications with Pettit & Martin would fall within the protection of the privilege. Stated differently, the fact that they had their own lawyer with respect to this sale makes it less likely that they would assume that the FSLIC was the holder of any privileges that might attach to communications they made in connection with the sale. If they did not perceive the FSLIC as the holder of their privilege, they would have felt no duty (arising out of the law of privilege) to maintain the confidentiality of communications they had with the FSLIC's attorney.

The third and arguably most important real world fact that undermines defendants' theory is that at all relevant times Pettit & Martin clearly and repeatedly has disclaimed representation of anyone other than FSLIC and FADA. In the papers they have submitted in connection with this motion defendants have repeatedly conceded that Pettit & Martin was never counsel for FSB or Farmers. More significant, Pettit & Martin clearly took the same position, and communicated it to the directors of Farmers and FSB, during the period the

efforts were being made to sell FSB. (FSB Bd. Mtg. Minutes, Exhibit 9 of Plaintiffs' Memorandum) By insisting at an FSB board meeting that it represented FSLIC and *not FSB*, Pettit & Martin strongly suggested that it (and FSLIC) did not consider FSLIC, Farmers and FSB to be legally identical, even for the limited purpose of controlling the privilege of communications with respect to the sale of FSB. Not surprisingly, it appears that key players in Farmers and FSB did not believe that Pettit & Martin served as counsel to either of these separate corporations or to their officers or directors. In deposition, Mr. Maisel, who was chairman of the boards of both Farmers and FSB during the relevant period, stated that Pettit & Martin did not represent anyone related to FSB. (Maisel Depo., at 83)

Given the facts described in the preceding paragraphs, coupled with the admission by the defendants that the documents in this category were distributed to a large number of persons, it clearly was unreasonable for the FSLIC and Pettit & Martin simply to assume that people at Farmers or FSB who generated documents for or received documents from Pettit & Martin (or FSLIC or FADA) would understand that they had no power to decide whether such documents should be shared with others, that all such documents were protected by a privilege held by FSLIC and were intended to be confidential, and that Farmers and FSB were bound under FSLIC's privilege to make sure that these documents remained secret. Rather, in the factual setting we have described, it was incumbent on FSLIC or its counsel to take clear, affirmative steps to make sure that all recipients of the documents in this category understood that FSLIC retained the power to determine whether such documents would remain confidential and that each recipient was obligated to preserve that confidentiality unless explicitly told otherwise by FSLIC.

There is no evidence that the FSLIC or its counsel took any such steps. That fact, by itself, tends to belie the claim that the documents were intended to remain confi-

dential. Nor have defendants produced any competent evidentiary support for their assertion that "it was understood that Pettit & Martin's communications with these individuals [at Farmers and FSB] were not to be disclosed to third parties." (Topinka Decl.) No officer or director of Farmers/FSB has submitted a declaration or affidavit that describes an understanding about confidentiality or what the basis for any such understanding might have been. The declarations by various people associated with the FSLIC, FADA, and Pettit & Martin that purport to describe "understandings" under which people at Farmers and FSB allegedly knew that they were to preserve the confidentiality of these communications are incompetent. Most of these declarations offer no basis whatsoever for these alleged "understandings."

There is only one declaration that even purports to suggest a basis for such an understanding: the declaration by Greg Mitchell, an agent of the FSLIC who was involved in overseeing Farmers while it was in the MCP. The basis suggested by Mr. Mitchell is that a federal regulation (now 12 C.F.R. § 510 *et seq.*) makes communications of the kind in issue here confidential. There are at least two difficulties with this suggestion. One is that Mr. Mitchell has offered us no evidence that would support an inference that anyone connected with FSD or Farmers knew that any such regulation existed or that it should be interpreted in the way Mr. Mitchell suggests. As important, we do not believe that the regulation even purports to do what Mr. Mitchell says it does. Section 510 does not even mention confidentiality. Nor is it clear that any of the subsequent sections covers the kinds of documents in issue here. Section 510.1, for example, covers only *ex parte* communications "with respect to applications to the Office [of Thrift Supervision] for permission to organize Federal savings associations and for branch office and mobile facilities … and with respect to any matter which is a hearing conducted by or on behalf of the Office." Moreover, far from requiring confidentiality, Part (d) of this section demands that such communications be transmitted to the Secretary of the Office, who would then place them in the public record.

Section 512.3 is similarly unhelpful. Titled "Confidentiality of proceedings", it reads:

> All formal examination proceedings shall be private and … all investigative proceedings shall also be private. Unless otherwise ordered or permitted by the Office [of Thrift Supervision], or required by law, … the entire record of any investigative proceeding or formal examination proceeding, including the resolution of the Office or its delegate(s) authorizing the proceeding, the transcript of such proceeding, and all documents and information obtained by the designated representative(s) during the course of said proceedings shall be confidential.

This provision clearly applies to formal *proceedings* and private investigations; how it could be construed as having any bearing on the kinds of documents in issue here remains a complete mystery.

We also feel constrained to point out that Mr. Mitchell's declaration makes a separate point that is directly at odds with the notion that communications from Farmers or FSB to Pettit & Martin, or to FSLIC or FADA, should be protected by the attorney-client privilege. Mr. Mitchell insists that "[p]roviding information to the FSLIC through its agents was not discretionary on the part of Farmers Savings. It was required to do so, inter alia, pursuant to 12 U.S.C. § 1464(d) and 12 C.F.R. §§ 563.17–1 and 563.18." (Mitchell Decl. of June 5, 1990) Without deciding whether we agree with Mr. Mitchell's reading of these regulations, we note that the attorney-client privilege does not attach to communications which clearly would have been made even absent any effort to seek legal advice; thus, the privilege cannot attach to communications made pursuant to some independent legal obligation, unless, at a minimum, the law that imposes that obligation also guarantees the confidentiality of the communications it compels. *Cf. Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct.

1569, 1577, 48 L.Ed.2d 39 (1976) As noted above, no one has directed our attention to any provision in federal statutes or regulations that purports to preserve the confidentiality of communications of the kind in issue here.

Given the circumstances we have described in the preceding several paragraphs, we find that defendants have failed to make a *prima facie* showing that the communications in this category were understood by people at Farmers/FSB to be confidential. Thus defendants have failed to satisfy one of the crucial prerequisites for invoking the privilege. Since they have failed to establish a necessary element, we need not reach questions of waiver.

We already have given defendants two opportunities to submit evidence on these matters, and since it would not have been reasonable for defense counsel to assume that plaintiffs or the court would expect communications in this category to be confidential, we cannot justify the burdens that would result if we offered defendants yet a third opportunity to submit declarations or evidence on the issues discussed in this section. We therefore ORDER defendants to disclose to counsel for plaintiffs, by August 27, 1990, all documents that reflect or contain communications that Pettit & Martin, FSLIC, FADA, Sifferman, or Zech made to, shared with (by way of informational copy or otherwise), or received from personnel at Farmers and/or FSB.

CATEGORY D: *Communications Between Downey, Brand and their Clients Farmers/FSB*

Communications in this category can be subdivided into two groups: those that were shared with Pettit & Martin, FSLIC, FADA, or their consultants, and those that were shared with no one outside Downey, Brand and Farmers or FSB.

■ For reasons set forth in the preceding section, defendants may not, on the specific record before the court in this matter, use a "sellers group" theory to sustain invocation of the attorney-client privilege with respect to documents that were generated by FSB/Farmers or their counsel (Downey, Brand) and that were shared with FSLIC, FADA, their counsel or consultants. While we do not rule out the possibility that on a factual record different from the one before the court we might find that counsel and parties had taken sufficient steps to preserve the privileged status of documents shared with other corporations or their counsel,[2] the defendants have failed to show that such steps were taken in this action.

Similarly, it is not inconceivable that, on a different record, work product protection might attach to some of the documents in this group, even though they were shared with Pettit & Martin, FSLIC, and/or FADA. Because Pettit & Martin insisted, however, that it did not represent FSB, because there is some reason to infer that FSLIC and the members of FSB did not have coterminous interests with respect to allocating the compensation generated by the simultaneous sale of FSB and settlement of the *Anders* action, and because defendants have failed completely (as discussed in the next section) to justify their efforts to invoke work product protection for any of the documents they have withheld,[3] we must reject arguments that would seek work product protection for documents in this group.

We therefore ORDER defendants to produce to counsel for plaintiffs, by August 27, 1990, all communications between Downey, Brand and its clients, Farmers or FSB, that were shared with FSLIC, FADA, their consultants or counsel.

■ The second group of documents in this category would consist of communications between Downey, Brand and its clients, Farmers/FSB, that were not shared

---

2. *Cf. Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Hewlett–Packard Co. v. Bausch & Lomb Inc., et al.,* 115 F.R.D. 308 (N.D.Cal.1987).

3. Among other things, defendants have presented no declarations from Downey, Brand or Farmers/FSB that purport to invoke the protection of the work product doctrine or that tend to show that the prerequisites for its use could be satisfied.

with anyone. Plaintiffs argue that since they control FSB, they have the power to waive any privilege that might attach to communications to which FSB was a party or privy, even communications that occurred when FSB was not owned by them, but was a wholly owned subsidiary of Farmers (old or new). Plaintiffs base this argument on the proposition, squarely accepted by at least two courts, that the purchaser of a corporate entity buys not only its material assets but also its privileges. *See Medcom Holding Co. v. Baxter Travenol Lab.*, 689 F.Supp. 841 (N.D.Ill. 1988); *Polycast Tech. Corp. v. Uniroyal, Inc. et al.*, 125 F.R.D. 47 (S.D.N.Y.1989) We find the opinions just cited persuasive. Since the attorney-client privilege over a corporation belongs to the inanimate entity and not to individual directors or officers, control over privilege should pass with control of the corporation, regardless of whether or not the new corporate officials were privy to the communications in issue. Plaintiffs now control FSB's decision-making. Their desire to waive FSB's privilege over communications made prior to the purchase is determinative. As *Medcom* and *Polycast* make clear, plaintiffs' power to waive the privilege (and gain access to otherwise privilege communications) extends to all communications to which FSB was a party or privy, even those communications to which Farmers also was a party or privy and with respect to which Farmers was a joint holder of the privilege.[4] Thus we ORDER defendants to produce to counsel for plaintiffs, by August 27, 1990, any documents embodying communications with Downey, Brand to which FSB was a party or privy (including any communications involving Farmers and/or SPI).

The principles that inform the holdings in *Medcom* and *Polycast*, however, offer no support to an argument that FSB has the power to waive privilege with respect to communications between Farmers and Downey, Brand to which FSB was not a party or privy.[5] If defendants have withheld any such documents, they are hereby ORDERED to provide for each one all the information demanded in paragraph 2 of the Standing Order that is attached as Appendix A. Defendants are reminded, in particular, of their obligation thereunder to file declarations that support an inference that the communications were made in confidence and primarily for the purpose of generating legal advice.

### III

### THE ASSERTED WORK PRODUCT PROTECTION

■ In addition to invoking the attorney-client privilege, defendants have asserted work product protection for virtually every one of the 700 documents they have withheld from production. (Plaintiff's Memo., Exhibit 29) It is not necessary to reach many of the substantive issues (including waiver) triggered by this mass assertion of protection because defendants have failed completely to present any competent evidentiary support for their vague and unsupported contention that the work product doctrine applies to the documents in question. It is axiomatic that work product protection in federal court may extend only to documents prepared "in anticipation of litigation or for trial...." Federal Rule of Civil Procedure 26(b)(3). Defendants have submitted no competent evidence that would tend to support an inference that any of the documents they have withheld was prepared in anticipation of litigation or for trial. They have had more than ample opportunity to offer evidence on this issue. Yet they failed to do so in their original objections, in connection with their privilege log, in their initial opposition to this motion, or in the supplemental opposition papers the court permitted them to file. None of the declarations by lawyers or clients that defendants have submitted contains even an intimation that any of the

---

4. No one has suggested that the very narrow "joint defense" doctrine applies here.

5. Since the same people made up the boards of Farmers and FSB, it might be difficult to show that FSB was not privy to any of the corporate level communications between Farmers and Downey, Brand.

withheld documents were prepared in anticipation of litigation. This omission is especially glaring in light of the fact that most, if not all, of the documents on the log apparently were prepared in connection with the effort to sell FSB, an effort that clearly had a "business" purpose. While the *Anders* litigation formed part of the environment in which the sale transaction was made, the defendants have not pointed to a single document on their log that they claim was generated primarily for use in that case. And even though plaintiffs' motion addresses the work product issue, the defendants' papers present only a short, conclusory, and, in places, impenetrable argument in support of the claim of work product protection. Because the law clearly places on the party who seeks to avoid disclosure through the work product doctrine the burden of making a showing sufficient to support findings on all the elements that must be established for protection to apply, *Hartford Fire Ins. v. Garvey*, 109 F.R.D. 323, 328 (N.D.Cal.1985), and because defendants have made no such showing, we hereby reject their claims to protection under this doctrine and ORDER defendants to produce to plaintiffs' counsel, by August 27, 1990, all documents that the attorney-client privilege, as construed and applied in the earlier sections of this opinion, does not protect.

## IV

### SUMMARY OF ORDERS

In response to plaintiffs' motion to compel documents withheld based on attorney-client privilege and/or work product doctrine, the court hereby enters the following ORDERS:

1. By August 27, 1990, defendants shall either affirm that no documents have been withheld that are not covered by the categories described by this opinion or, should there be any such documents, provide, for each such document, all the information demanded in paragraph 2, sections 1 through 8 of the Standing Order that is attached hereto as Appendix A.

2. For communications in category A ["Communications between Pettit & Martin and FADA (that were shared with no one other than FSLIC and/or FADA's consultants)"], by August 27, 1990, defendants shall provide additional information about each communication in this category that defendants continue to insist is entitled to protection by the privilege. For each such communication, defendants must provide all the information called for in paragraph 2 of the Standing Order attached as Appendix A. Moreover, to satisfy section 4 of paragraph 2 of the Standing Order, defendants shall submit competent evidence (by way of declaration or otherwise) that would support an inference that the communication was made primarily in order to generate legal advice and that neither business purposes nor regulatory requirements would have provided sufficient incentive to make the communication. These declarations must be by the author of the communication or by the person at whose direction the communication was made.

Since the Standing Order also requires defendants to identify all persons or entities to whom copies of the communications in question were sent, and since the court has concluded that an attorney-client relationship existed involving, simultaneously, FSLIC, FADA, and Pettit & Martin, defendants need not submit additional declarations to establish the confidentiality of documents in this category that were not copied to persons outside FSLIC, FADA, and Pettit & Martin.

3. For documents in category B ["Communications between Pettit & Martin and Mr. Siffermann and/or Mr. Zech (that were shared either with no one, or with no one other than FADA and FSLIC)"], by August 27, 1990, defendants shall complete their privilege log in compliance with the attached Standing Order (Appendix A) for all communications between Siffermann and/or Zech and Pettit & Martin, over which defendants can and do still assert the privilege, consistent with the principles stated in this opinion and with Fed.R.Civ.P. 11 and 26(g). To satisfy section 4 of paragraph 2 of the Standing Order for each withheld communication in this category, defendants must submit competent evi-

dence (in the form of a declaration signed by the communicator or the person at whose direction the communication was made) showing that it was made primarily for the purpose of generating legal advice.

Defendants shall produce, by August 27, 1990, all communications in category B over which they cannot continue to claim the privilege in good faith.

4. By August 27, 1990, defendants shall disclose to counsel for plaintiffs all documents which fall within category C, above, i.e., all documents that reflect or contain communications that Pettit & Martin, FSLIC, FADA, Siffermann, or Zech made to, shared with (by way of informational copy or otherwise), or received from personnel at Farmers and/or FSB.

5. By August 27, 1990, defendants shall disclose to counsel for plaintiffs all communications between Downey, Brand and its clients, Farmers or FSB, that were shared with FSLIC, FADA, their consultants or counsel.

6. By August 27, 1990, defendants shall disclose to plaintiffs' counsel all documents that contain or reflect communications with Downey, Brand to which FSB was a party or privy (including any communications involving Farmers and/or SPI).

7. If defendants have withheld any documents containing or reflecting communications between Farmers and Downey, Brand to which FSB was not a party or privy, they shall (by August 27, 1990) provide for each such document all the information demanded in paragraph 2 of the Standing Order that is attached as Appendix A. Defendants are reminded, in particular, of their obligation to file declarations that support an inference that the communications were made in confidence and primarily for the purpose of generating legal advice.

8. Because they have failed to show that any of the documents that they have withheld are in fact protected by the work product doctrine, defendants may not rely on that doctrine to attempt to justify refus-al to produce any of the documents on their privilege log.

IT IS SO ORDERED.

## APPENDIX A

### STANDING ORDER RE MOTIONS AND DISCOVERY MATTERS REFERRED TO MAGISTRATE BRAZIL

This order applies to all motions and discovery matters referred to United States Magistrate Wayne D. Brazil.

### LAW AND MOTION AND DISCOVERY HEARING PROCEDURES

The court offers two hearing procedures for civil matters, either of which is available *only after* the parties' meet and confer efforts have failed. See Local Rule 230–4(a).

#### 1. Law and Motion Calendar

Civil Law and Motion will be heard on Wednesdays at 2:00 p.m. All matters that are inappropriate for expedited hearings should be noticed in compliance with the Local Rules. The briefing and hearing of motions in accordance with the formal requirements of the Local Rules is preferred with respect to motions that might be case-dispositive or that involve numerous factual or legal issues or especially sensitive concerns.

#### 2. Expedited Hearings

The court offers expedited hearings, primarily to resolve discovery disputes. The court intends the expedited procedures to afford a swift but full hearing following abbreviated and simultaneous briefing by the parties.

Parties choosing the expedited procedure must first telephone the law clerk to calendar a hearing, which will be set approximately ten (10) days from the time of the request, depending on the schedule of the court and the parties. Following the calendaring, the party requesting the hearing must notify the opposing party by telephone, and then confirm by letter to the court and opposing counsel the date and

time of the hearing and the deadline for filing letter briefs.

Letter briefs of up to five (5) pages shall be filed by all parties simultaneously no fewer than five (5) days prior to the expedited hearing, with conformed copies delivered or mailed to chambers. The letter briefs shall contain all relevant information, including: dates of discovery cut-off, pretrial conference, and trial; a discussion of the dispute, and a description of the efforts already made to resolve the dispute.

The expedited hearing will be conducted via telephone conference call to the court, to be initiated by the moving party, at (415) 556–2696. Personal appearances will be allowed by special request or ordered by the court as appropriate.

Even though this alternative procedure is expedited, the court gives full attention to the matter and issues orders that may fully resolve the dispute or that set, as necessary, tailored schedules for further briefing.

### FILINGS

At the time of the filing of any document in any referred or pending matters before the Magistrate, an extra conformed copy shall be delivered to the Magistrate's office (room 17423).

### DISCOVERY DIRECTIONS

The court expects counsel to share information informally to the extent feasible and to conduct discovery in a spirit of cooperation and efficiency.

Counsel must meet and confer in a good faith effort to resolve any problems that arise in discovery, in conformity with Local Rule 230–4(a) and (b).

### 1. Assertion of Privilege: Generally

A party who, relying on any privilege or the work product doctrine, does not produce all requested documents, or does not fully answer a discovery probe, must state in its response to the request or probe that it is invoking a privilege. A party who invokes a privilege must specify which privilege or doctrine it is invoking.

### 2. Attorney–Client Privilege

A party who invokes the attorney-client privilege also must provide to the opposing party the following information for each document or communication not disclosed, to the extent that providing this information will not destroy the privilege:

(1) the name and job title or capacity of the author(s) or originator(s); and

(2) the name and job title or capacity of every person who received the document or a copy of it, or who was present when the communication was made or who overheard it; and

(3) the relationship between the author(s)/originator(s) and each person who received the document or a copy of it or who was present when the communication was made or who overheard it; and

(4) whether the primary purpose of the document or communication was to seek or provide legal advice or services; and

(5) the date of the document or communication; and

(6) the subject matter(s) addressed in the document or communication; and

(7) whether the document or communication was transmitted in confidence; and

(8) a brief statement as to why, under the law, the document or communication is protected by the attorney-client privilege.

### 3. Work Product Doctrine and Other Privileges

A party who invokes the work product doctrine or a privilege other than the attorney-client privilege must provide to the opposing party the following information for each document or communication not disclosed, to the extent that providing this information will not destroy the privilege:

(1) which doctrine or privilege the party is relying on; and

(2) whether federal or state law of privilege applies to the documents or communications in question, and, if state law applies, which state; and

(3) a list of every requirement or element that must be satisfied in order to assert successfully the privilege or doctrine, with citation to legal authority supporting the list of elements presented; and

(4) with respect to each document or communication for which the doctrine or privilege is invoked, information that shows that each element of the doctrine or privilege is satisfied.

### 4. Contention Interrogatories: Generally

For the purpose of this section contention interrogatories are broadly defined as questions that ask an opposing party to state the facts, evidence, or legal theories upon which it bases its specified contention(s) or that ask an opponent to explain or defend his or her contention(s). As here used, the phrase "contention interrogatories" does *not* include questions requesting a party to identify the names of witnesses or other persons with knowledge of the alleged events that gave rise to the litigation. Nor does the general definition apply to a request for production of documents (Federal Rule of Civil Procedure 34) that are relevant to material factual allegations. The following statement sets forth the Magistrate's policies and procedures regarding contention interrogatories.

### 5. Basic Procedure re Contention Interrogatories

Where a party who has received contention interrogatories has a good faith objection to the content or timing of the questions, that party shall communicate with the proponent, and both counsel shall make good faith efforts to resolve the dispute. If the dispute persists, then, within the period set forth in Federal Rule of Civil Procedure 33, respondent shall file and serve its objections to each interrogatory pursuant to Local Rule 230–1 or shall seek the court's permission to object to the entire set. Thereafter, the proponent has the burden of seeking and justifying the issuance of an order compelling answers.

### 6. Policy and Factors Considered re Contention Interrogatories

A party who serves contention interrogatories *early* in the pretrial process, before discovery by document production and deposition has been substantially completed, must overcome a presumption against compelling answers when its opponent's pleading is not facially infirm. The propounding party might overcome this presumption by showing clearly that answers to its contention interrogatories would substantially contribute to one or more of the following: a) clarifying issues in the case; b) narrowing the scope of the dispute; c) improving prospect for settlement; or d) providing a real basis for motions that would remove a party from the case or dispose of significant parts of the litigation. A propounding party's attempt to meet its burden of justifying contention interrogatories served *early* in the pretrial process must include specific and nonconclusory bases for its belief that responses would advance these or other objectives of the Federal Rules of Civil Procedure. The Magistrate will take into account the extent to which substantially similar information is available by other discovery devices.

### SANCTIONS

Any party who seeks sanctions must comply with Local Rule 230–4(f) by submitting both a statement describing the basis for the request and a declaration setting forth, in itemized form, an account of the hours spent by counsel (including what work was done during those hours) and of other expenses incurred as a consequence of the alleged breach of an obligation by another attorney or party.

IT IS SO ORDERED.