## In re BIETER COMPANY, Petitioner.

### No. 94–1037.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 5, 1994.

Decided Feb. 16, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied April 25, 1994.

James P. McCarthy and Michael D. Olafson of Minneapolis, Minnesota, represented the petitioner.

George C. Hoff and Thomas G. Barry, Jr., of Eden Prairie, Minnesota, represented the respondent Beatta Blomquist.

Joseph W. Anthony and Norman J. Baer of Minneapolis, Minnesota, represented the respondents Cliff Road Properties, Advance Developers, Inc., Hoffman Development Group, Inc., HDG Associates Limited Partnership, Eagan Associates Limited Partnership, CRP of Eagan, Inc., Robert L. Hoffman, Patrick C. Hoffman and Jack F. Daly, Jr.

Robert C. Bell of Roseville, Minnesota, represented respondent Federal Land Company.

Gerald L. Svoboda, Richard G. Jensen, and Jocelyn L. Knoll of Minneapolis, Minnesota, represented respondent Dorsey & Whitney.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HEANEY, Senior Circuit Judge.

Bieter Company petitioned this court for a writ of mandamus that would direct the district court to vacate an order compelling discovery of material, through both document requests and depositions, that Bieter asserts to be protected by the attorney-client privilege and the work-product doctrine. Bieter also moved this court for a stay of that order pending resolution of this petition. We granted that motion[1] and requested a response to the petition. *In re Bieter Co.*, 16 F.3d 929 (8th Cir.1994). Having carefully reviewed the record before us and the applicable law, we find that the district court's order constitutes a clear abuse of discretion, and we shall therefore issue the writ.

I

This case has a rather tortured history, very little of which is relevant to the dispute before us. In short, Bieter is a Minnesota partnership formed to develop a parcel of farm land in Eagan, Minnesota. After running into various obstacles, including a lack of cooperation from local government and assorted machinations by competing developers, Bieter resorted to legal action. It sued the city in state court and the instant defendants in federal court, first alleging antitrust violations and then amending the complaint to allege claims under the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961–1968. While discovery was still in progress on the RICO and third-party claims, the district court granted summary

---

1. The motion for a stay arose in an unusual circumstance. Although such motions should ordinarily be presented to the district court initially, Bieter was informed that none of the district court judges were available. It subsequently brought its motion to this court, explaining the unusual circumstances by affidavit, and we then granted the stay. The respondents contend that Bieter delayed seeking this writ and the corresponding stay until the last possible minute, implying something less than good faith on Bieter's part. Bieter indicates that it assumed the respondents would forego scheduling any of the depositions to which it objects until the petition seeking mandamus had been resolved. In any event, we believe that, given the importance of the issues presented, the stay was appropriate.

judgment to the defendants. We reversed, *Bieter Co. v. Blomquist*, 987 F.2d 1319 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993),[2] thereby causing discovery to begin anew. Motions to compel that had been mooted by the grant of summary judgment were renewed, including the motion that led to the order at issue in this petition.

Bieter and third-party defendant Dorsey & Whitney, a Minneapolis law firm that represented Bieter in this action until the third-party complaint against it was filed, assert that certain documents requested and matters into which respondents have inquired at depositions are protected by the attorney-client privilege or, in the alternative, by the work-product doctrine. A motion was brought to compel discovery on these issues, and a hearing was conducted before a magistrate, after which he ruled that the material in question was not protected because it had been disclosed to Dennis S. Klohs, an individual who has worked closely with Bieter both in its attempt to develop the parcel in Eagan and in the subsequent litigation. The magistrate ruled that Klohs was neither an employee of Bieter nor the client of Dorsey, so any disclosure to him destroyed whatever privilege may have otherwise applied. *Bieter Co. v. Blomquist*, No. 3–89–Civ–759, slip op. at 8 (D.Minn. Sept. 20, 1993). The magistrate noted the existence of "recognized exceptions" to the rule he applied, but found "no evidence to suggest that Klohs' relationship with Bieter Company constitutes such an exception." *Id.* Bieter and Dorsey appealed to the district court, which summarily affirmed the order, finding that it was neither clearly erroneous nor contrary to law. Bieter then petitioned this court for a writ of mandamus.

## II

Although the writ of mandamus is an extraordinary writ and "is not ordinarily available to a litigant to obtain appellate review of interlocutory discovery orders," *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 599 (8th Cir.1977), we have held it to be an appropriate means to review certain types of discovery orders. For example, we have held " 'mandamus to be an appropriate vehicle to review orders compelling the production' of trade secrets in the form of confidential business information." *In re Remington Arms Co.*, 952 F.2d 1029, 1031 (8th Cir.1991) (quoting *Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949, 953 (8th Cir.), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1997, 60 L.Ed.2d 376 (1979)). We have also "held that mandamus is available as a means of immediate appellate review" when "a claim of attorney-client privilege has been raised in and rejected by a district court." *Diversified,* 572 F.2d at 599.

The common threads running through those cases that we have held fit for review by mandamus are the presence of "serious policy considerations ... sufficiently compelling to require immediate appellate attention," *Iowa Beef,* 601 F.2d at 954, and the inadequacy of later review as a remedy. *Pfizer, Inc. v. Lord,* 456 F.2d 545, 548 (8th Cir.1972) (" '[B]ecause maintenance of the attorney-client privilege up to its proper limits has substantial importance to the administration of justice, and because an appeal after disclosure of the privileged communication is an inadequate remedy, the extraordinary remedy of mandamus is appropriate.' " (quoting *Harper & Row Publishing Co. v. Decker,* 423 F.2d 487, 492 (7th Cir.1970), *aff'd by an equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971))); *see also United States v. Victoria–21,* 3 F.3d 571, 575 (2d Cir.1993) ("the exercise of mandamus powers relating to discovery disputes constitutes a unique branch of the law" that is only invoked when "effective review on appeal

---

**2.** The gist of Bieter's RICO claim is that the competing developers bribed the mayor and city council members through various means, thus preventing approval of Bieter's application for rezoning. The district court held that Bieter failed to satisfy RICO's injury and causation requirements, but we found that the lower court had adopted "excessively narrow views of causation and injury," and that if we limited RICO's application as did the district court, "we not only would undermine RICO as a means of rooting out public corruption, but we would provide a formula to those who seek to achieve private gain through corruption of our democratic processes." *Bieter,* 987 F.2d at 1320. For a summary of the predicate acts asserted, see our earlier opinion at 1323–25.

from a final judgment in the case is difficult or effectively unobtainable, as would be the case, for example, where discovery of alleged privileged documents is ordered"); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1422 (3d Cir.1991) (holding mandamus available to review order compelling production of documents claimed to be privileged but unavailable to review order upholding work-product doctrine).

It goes without saying that not all orders compelling discovery of allegedly privileged materials are appropriate for review by mandamus. This court has never articulated a test for when such review is appropriate, but has simply held that it is available in such cases as a general matter. The Ninth Circuit has formulated a test, since adopted by the Sixth Circuit, which is, at a minimum, instructive. *See In re Bendectin Prods. Liab. Litig.,* 749 F.2d 300, 303–05 (6th Cir. 1984) (citing *Bauman v. United States Dist. Court,* 557 F.2d 650, 654–55 (9th Cir.1977)). The *Bauman* court outlined five guidelines that it had distilled from the case law to help in deciding whether issuance of the writ is appropriate:

> (1) The party seeking the writ has no other adequate means, such as direct appeal, to attain the relief desired. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman,* 557 F.2d at 654–55 (citations omitted).

Although these guidelines were designed to aid in determining when issuance of the writ is proper, the considerations raised also apply to the threshold question of when petitions for the writ merit full-blown review

instead of denial without opinion. *See* Fed. R.App.P. 21(b). This question remains largely one of discretion, as does issuance of the writ itself, *see In re Ford Motor Co.,* 751 F.2d 274, 275 (8th Cir.1984), but these guidelines provide some direction.

■ In this case, three of the five factors have certainly been satisfied. Each petition that seeks review of an order compelling discovery of allegedly privileged materials will satisfy the first two guidelines, *see, e.g., Admiral Ins. Co. v. United States Dist. Court,* 881 F.2d 1486, 1491 (9th Cir.1989), and our review of the available case law and scholarship indicates that this is an issue of law of first impression, thus satisfying the fifth guideline.[3] Other courts have noted that "the fourth and fifth guidelines can seldom be consistent with each other." *Bendectin,* 749 F.2d at 306 n. 16; *see Admiral,* 881 F.2d at 1491. In a case such as this, review may well be appropriate if either the fourth or the fifth guidelines are satisfied because the first two guidelines will presumably be satisfied as well.

Issuance of the writ does not follow automatically on a decision that review is appropriate. *Westinghouse,* 951 F.2d at 1422. Under the *Bauman* court's test, the writ would issue if, in addition to the satisfaction of the three guidelines mentioned above, "[t]he district court's order is clearly erroneous as a matter of law." 557 F.2d at 654–55; *accord Bendectin,* 749 F.2d at 305–06; *see also Sporck v. Peil,* 759 F.2d 312, 314 (3d Cir.) ("a writ of mandamus will only be granted for clear error of law"), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Following various Supreme Court decisions, we have indicated that the writ may only issue "in those exceptional circumstances amounting to a judicial usurpation of power," *Ford,* 751 F.2d at 275, or when "there is clear abuse of discretion." *Remington,* 952 F.2d at 1031.

Bieter asserts that the district court clearly abused its discretion in compelling discovery over Bieter's assertion of privilege, but to

---

**3.** The *Westinghouse* court expressed this requirement in terms of " 'the instructional goals of mandamus.' " 951 F.2d at 1422 (quoting *United States v. Christian,* 660 F.2d 892, 897 (3d Cir.

1981)). As in that case, we find that the lower courts would benefit from a discussion of these issues.

the extent that any error may have occurred, it appears to be more properly one of law. The district court, insofar as its reasoning is set forth in the magistrate's report and recommendation, appears to have limited the scope of its legal analysis too narrowly. "Abuse of discretion occurs if the district court['s] ... decision relies on erroneous legal conclusions." *International Ass'n of Machinists v. Soo Line R.R. Co.*, 850 F.2d 368, 374 (8th Cir.1988), *cert. denied*, 489 U.S. 1010, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). Likewise, "a failure to consider relevant factors or to apply the proper legal standard constitutes ... an abuse" of discretion. *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 973–74 (2d Cir.1987).[4] It follows, then, that a clear failure in this regard may constitute a clear abuse of discretion.

This court has indicated that "clear legal error" standing alone does not necessitate issuance of the writ, for such a policy would result in all erroneous interlocutory orders becoming subject to review under the All Writs Act. *See Ford*, 751 F.2d at 276; *see also In re NLO, Inc.*, 5 F.3d 154, 156 (6th Cir.1993). But when a court clearly fails to apply the proper legal standard and issues an order that, if complied with, will result in irremediable harm, issuance of the writ may be appropriate.

### III

We turn, then, to the existence of the legal error, if any, made by the district court. We first review the record evidence on the nature of the relationship between Klohs and Bieter before discussing the applicable law and applying it to the facts presented.

### A

As noted above, Bieter is a partnership formed to develop a parcel of farmland in Eagan. The principals are Hugh Thorson and Ronald Cornwell. Thorson lives outside the state, and as a result, Cornwell is responsible for the day-to-day operations. Klohs has been involved with Bieter since mid–1986. He and Cornwell work out of Bieter's office in Edina, which also serves as the office of the Cornwell/Klohs Company, another real estate development firm. Both Cornwell and Klohs attest to their daily interaction and to Klohs's intimate involvement in Bieter's attempt to develop the parcel in Eagan (known in the affidavits as the 35E/Diffley Center development). *See* Affidavit of Ronald Cornwell ¶ 2 (Feb. 18, 1992) (hereinafter Cornwell Aff.); Affidavit of Dennis S. Klohs ¶¶ 3, 5, 6 (Feb. 17, 1992) (hereinafter Klohs Aff.).

The relationship was formalized in an agreement dated July 1, 1986, between Bieter and Klohs. Klohs was retained as an independent contractor to provide advice and guidance regarding commercial and retail development in Minnesota. The agreement provided for Klohs to work out of Bieter's office and to be paid a monthly fee and expenses. The agreement was to run for one year, and its primary purpose appears to have been the acquisition of Target Stores as a tenant in the 35E/Diffley Center development. This understanding is reinforced by deposition testimony Cornwell gave prior to this discovery dispute. *See* Bieter App. at 56. In a paragraph labeled "Relationship of Parties," it was made clear that Klohs was an independent contractor, and that he was expressly not an agent, employee, or partner of

---

4. Judge Newman commented at some length on the anomaly of legal error constituting an abuse of discretion. His analysis bears repeating:

   Though recited frequently in the reported decisions, including our own, this formulation of an incorrect application of a legal standard as constituting an "abuse of discretion" is not entirely satisfactory.... Discretion is said to be "abused" ("exceeded" would be both a more felicitous and correct term) when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts. This determination that the range of

   acceptable decision-making has been exceeded in a particular case is assuredly one of law, but it is analytically distinct from a determination that a legal standard applicable to a generality of fact situations has been ignored, incorrectly applied, or inadequately applied in a particular case.... In such cases, it would be clearer to say directly that the decision is revised because of an error of law, rather than call such an error an abuse of discretion. *See* Friendly, *Indiscretion About Discretion*, 31 Emory L.Rev. 747, 773–78 (1982).

   *Stormy Clime*, 809 F.2d at 974.

Bieter. This agreement was modified in September 1986, changing the effective date from July 1 to September 1.

The agreement apparently expired on August 31, 1987, and an employment agreement was entered into between Bieter and Klohs on November 1, 1990. The record does not indicate what, if any, formal relationship existed between Bieter and Klohs from September 1987 through October 1990, though the affidavits of Cornwell and Klohs do not indicate that any particular significance was placed on the formal aspects of their relationship, and it appears that Klohs's duties remained substantially the same throughout.[5]

Those duties were, as Klohs tells us, "varied and extensive." Klohs Aff. ¶ 3. His primary responsibility was to secure tenants for the development. *Id.; see also* Bieter App. at 56. He worked with architects, consultants, and counsel, and appeared at public hearings before the Eagan City Council and the Eagan Advisory Planning Commission. Klohs Aff. ¶ 3. He tells us that he was "viewed by and dealt with by City of Eagan officials, Target and other potential tenants, the media, and the defendants in this lawsuit as a representative of Bieter." *Id.* ¶ 5.[6]

Klohs's involvement with counsel was rather extensive. *See id.* ¶ 7; Cornwell Aff. ¶ 5. He often attended meetings with counsel, either alone or with Cornwell. As is evidenced by the list of documents that Dorsey and Bieter have refused to produce, Klohs received many communications from attorneys, both those sent directly to him and those on which he was copied. *See* Cliff Road App. at 1–2. When he was deposed

shortly after this dispute began in state court, Dorsey represented him. His meetings with Dorsey before that deposition and since have involved the attempted 35E/Diffley development and the resulting litigation.

Dorsey's understanding of the relationship is embodied in the affidavit of attorney John Levine. He confirms what Klohs and Cornwell have stated, indicating that he viewed Klohs as Bieter's representative and that he worked closely with Klohs as this litigation developed. Affidavit of John D. Levine ¶ 3 (Feb. 18, 1992) (hereinafter Levine Aff.). He adds that Klohs "has been significantly involved in the investigation of Bieter's claims." *Id.* Klohs, Cornwell, and Levine indicate that these communications have been treated as confidential and were intended to be kept so. *Id.* ¶ 5; Klohs Aff. ¶ 7; Cornwell Aff. ¶¶ 6, 7.

In short, the case presents an individual who, while acting as an independent consultant to the client, has been involved initially in the attempt to develop a parcel of property (the development of which appears to be the *sine qua non* of the client's existence) and subsequently in the litigation that resulted from the failure to develop said property. Despite any assertions to the contrary, it appears that this consultant was neither the client nor an employee of the client, but was instead a representative of the client. The legal question presented is whether communications either between this consultant and counsel or merely disclosed to the consultant necessarily fall outside of the scope of the attorney-client privilege because the consultant was neither the client nor an employee of the client.

---

5. Bieter also asserts that Klohs had an equity interest in the development, and, through some rather creative though unpersuasive reasoning, that he was responsible for paying Dorsey's fees as a result. This argument has numerous flaws, including the contingent nature of this interest (respondents label it, not unfairly, a "commission") and the fact that the agreement that serves as the basis for this asserted interest ended in August 1987. Bieter then argues that the interest continued in some unwritten fashion, relying on Cornwell's assertion that "Klohs undertook his efforts [on Bieter's behalf] with the understanding that he would also be treated fairly in the event of successful development of the 35E/Diffley Center." Cornwell Aff. ¶ 4; *see* Klohs Aff. ¶ 4. Although this may be the case,

we find it unpersuasive as evidence that Klohs was the client of Dorsey, and we feel it adds little to our understanding of the relationship Klohs had to Bieter, which is the basis of our ruling today.

6. Although one might question Klohs's competence on the issue of how others viewed him, his assertion apparently finds support in a proposed counterclaim filed by the respondents who brought the motion at issue. *See* Bieter Br. at 4–5 (quoting paragraphs of the filing in question in which it is asserted that Thorson, Cornwell, and Klohs—the proposed third-party defendants—operated as Bieter Company in 1986 and 1987).

B

■ The federal common law of attorney-client privilege applies to this civil RICO action. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *see also Hansen v. Allen Memorial Hosp.*, 141 F.R.D. 115, 121 (S.D.Iowa 1992). Proposed Federal Rule of Evidence 503, which is also known as Supreme Court Standard 503, provides a useful starting place for our discussion. Although not enacted by Congress, "courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege.... 'Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts.' 2 J. Weinstein, *Evidence* ¶ 503[02] at 503–17 (1975)." *United States v. Spector*, 793 F.2d 932, 938 (8th Cir.1986) (citation omitted), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); *see United States v. (Under Seal)*, 748 F.2d 871, 874 n. 5 (4th Cir.1984) (Supreme Court Standard 503 "provides a comprehensive guide to the federal common law of attorney-client privilege"); *see also* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503[02], at 503–19 (1993) (restating quoted proposition) (hereinafter *Weinstein's Evidence* ). The most relevant aspect of Standard 503 is its statement of the general rule:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Supreme Court Standard 503(b).

Although the proposed rule defined various terms, the version communicated to Congress left the term "representative of the client" undefined. The definition proposed in 1969, and since adopted in a number of states, grew out of the so-called "control group" test used in determining the applicability of the privilege to a corporate client. The extent of the corporate attorney-client privilege came before the Supreme Court in 1970, but the Court divided evenly, leaving in place a Seventh Circuit decision that had rejected the "control group" test as too narrow in scope. *See Decker v. Harper & Row Publishers, Inc.*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), *aff'g by an equally divided court*, 423 F.2d 487 (7th Cir.1970). As a result, the Advisory Committee dropped its proposed definition of "representative of the client," leaving the issue to be decided on a case-by-case basis. *Weinstein's Evidence* ¶ 503[01], at 503–14; *see Diversified*, 572 F.2d at 606 n. 2 (Heaney, J., concurring and dissenting).

We addressed the applicability of the privilege to corporate clients in *Diversified*, rejecting the "control group" test and adopting a modified version of the *Harper & Row* test. *Diversified*, 572 F.2d at 608–09 (en banc). The Supreme Court subsequently rejected the "control group" test as well, but expressly refused to adopt another test, again leaving the issue for case-by-case determination. *Upjohn Co. v. United States*, 449 U.S. 383, 396–97, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981).

■ The test we adopted in *Diversified*, although expressly applicable to corporations and their employees, is no less instructive as applied to a partnership, or some other client entity (as opposed to an individual),[7] and its employees:

---

7. Supreme Court Standard 503(a)(1) defines the client as "a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer...." We agree with Judge Weinstein that the phrase "organization or entity" includes, at a minimum, partner-

ships. *See Weinstein's Evidence* ¶ 503(a)(1)[01], at 503–20; *see also* Restatement of the Law Governing Lawyers § 123 cmt. c (Tent.Draft No. 2, 1989) ("Once it is recognized ... that the privilege applies to the corporate form of organization there seems no basis for limiting it to corporations, as distinct from unincorporated associa-

[T]he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

572 F.2d at 609 (en banc).

The issue in this case is, of course, complicated by our initial conclusion that Klohs was not an employee of the partnership but rather was an independent consultant. Communications can, as Supreme Court Standard 503(b)(1) indicates, be privileged if they are between a representative of the client and the client's lawyer. The crux of the matter, then, is whether an independent consultant can be a representative of the client for purposes of applying the attorney-client privilege.

Little has been written on this question. Bieter cites to a number of cases in which the presence of individuals other than the client at attorney-client conferences was held not to destroy the privilege, focusing primarily on the intent of the client to keep the communications confidential. These cases strike us as not quite on point. Klohs was not, as we understand the record, simply present at some meetings between Cornwell and the attorneys; he was instead the sole representative of Bieter at a number of these meetings, and letters were written from the attorneys to Klohs directly. The only way in which the privilege could apply to the latter situations is if Klohs was Bieter's representative for the purpose of applying the attorney-client privilege.

Our research has uncovered only two analogous situations in the scholarship and the federal case law. The only analogous case is *McCaugherty v. Siffermann*, 132 F.R.D. 234

(N.D.Cal.1990), in which the court held that under the Supreme Court's analysis in *Upjohn*, the privilege would apply to communications between two independent consultants hired by the client and the client's lawyers just as it would apply to communications between the client's employees and its lawyers. 132 F.R.D. at 239. The only significant scholarship in this area appears in an article that analyzes the effect of *Upjohn* on the corporate attorney-client privilege and which argues that "at times there will be potential information-givers who are not employees of the corporation but who are nonetheless meaningfully associated with the corporation in a way that makes it appropriate to consider them 'insiders' for purposes of the privilege." John E. Sexton, *A Post–Upjohn Consideration of the Corporate Attorney–Client Privilege*, 57 N.Y.U.L.Rev. 443, 498 (1982).

*McCaugherty* arose from a not uncommon fact situation. The Federal Asset Disposition Association (FADA) hired two consultants, Sifferman and Zech, to assist in the disposition of FSB, Inc., on behalf of the Federal Savings & Loan Insurance Corporation (FSLIC). The law firm Pettit & Martin served as counsel to both FSLIC and FADA. The eventual buyers of FSB sued Sifferman and others, alleging that they had been defrauded in the negotiations leading to the sale. One of several discovery issues that arose in the course of the litigation was whether communications between the consultants and the lawyers were privileged. The plaintiffs argued that the privilege could not apply to any such communications because the consultants were not the lawyers' clients or employees of the clients. The district court framed the question as whether "Sifferman and Zech should be treated as the functional equivalents of employees of FADA and/or FSLIC, so that the privilege could attach to confidential communications" between them and the lawyers. *McCaugherty*, 132 F.R.D. at 239. Although the district court eventually held the privilege inapplicable for other reasons, it found that because

tions, partnerships, or sole proprietorships."); *id.* cmt. d ("In the case of a partnership, general partners and employees and other agents and

subagents of the partnership may serve as agents of the organization for the purpose of making privileged communications....").

the consultants "acted within the scope of their employment (by aiding FADA in the efforts to sell FSB) and under the direction of their supervisor, FADA, when communicating with Pettit & Martin" there was "no principled basis for distinguishing consultants Sifferman and Zech from the kinds of employees to whom the Supreme Court extended the protection of the privilege in *Upjohn.*" *McCaugherty,* 132 F.R.D. at 239.

Dean Sexton's article attempts to elucidate the general rule that the *Upjohn* Court specifically refused to announce. *See Upjohn,* 449 U.S. at 386, 396, 101 S.Ct. at 681, 686. *id.* at 402–04, 101 S.Ct. at 689–90 (Burger, C.J., concurring in part and concurring in the judgment). He announces five rules to "guide a principled application of the Court's opinion." Sexton, *supra,* at 487. The third of these proposed rules is that the "information-giver must be an employee, agent, or independent contractor with a significant relationship to the corporation and the corporation's involvement in the transaction that is the subject of legal services." *Id.* In explaining the rationale for including "independent contractors" in the rule, Dean Sexton presents the hypothetical of a corporation employing

> an accountant who, though an independent contractor, performs regular accounting services for a corporation over many years. As the accountant, he has an insider's knowledge of the corporation's operations that few people even on the corporation's payroll have. Assume he represents the corporation at an IRS audit. Finally, assume that a tax indictment issues against the corporation and that an attorney is retained. Clearly, the accountant has knowledge of extraordinary importance to the attorney's investigation of the tax matter. And, equally clearly, the logic of *Upjohn* commands that the mere fact that the accountant was not an employee of the corporation should not preclude application of the privilege. There is no reason to differentiate between an accountant-employee and a regularly retained outside accountant when both occupy the same extremely sensitive and continuing position as financial adviser, reviewer, and agent:

both possess information of equal importance to the lawyer.

> A literalistic extension of the privilege only to persons on the corporation's payroll would invariably prevent a corporation's attorney from engaging in a confidential discussion with a corporation's regular independent accountant, no matter how important the accountant's information would be to the attorney.

*Id.* at 498 (footnotes omitted).

We find the reasoning of both Dean Sexton and the *McCaugherty* court persuasive and believe that when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors. Such a distinction is consistent with neither the Supreme Court's decision in *Upjohn* nor our decision in *Diversified.*

Both decisions indicated that "the very purpose of the privilege" would be frustrated by application of the "control group" test because that test "discourag[es] the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation." *Upjohn,* 449 U.S. at 392, 101 S.Ct. at 684; *see Diversified,* 572 F.2d at 609 (en banc) ("In contrast to the control group test, [the *Harper & Row* test], encourages the free flow of information to the corporation's counsel in those situations where it is most needed."); Sexton, *supra,* at 459. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.... 'The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.'" *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682 (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980)). Such information will, in the vast majority of cases, be available from the client or the client's employees, but there undoubtedly are situations, such as the one described by Dean Sexton, in which too

narrow a definition of "representative of the client" will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely. "[I]t is only natural that," just as "[m]iddle-level—and indeed lower-level—employees . . . would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to . . . actual or potential difficulties," *id.* at 391, so too would nonemployees who possess a "significant relationship to the [client] and the [client]'s involvement in the transaction that is the subject of legal services." Sexton, *supra*, at 487.

## C

Applying these legal principles to the case before us presents two distinct questions: Is Klohs's relationship to Bieter of the sort that justifies application of the privilege, and if so, have the elements of the test we set forth in *Diversified* been satisfied?

■ The first question is the easier of the two, for the affidavits discussed above amply support the view that Klohs had the same sort of relationship as was present in *McCaugherty* and as envisioned by Dean Sexton. Klohs has been involved on a daily basis with the principals of Bieter and on Bieter's behalf in the unsuccessful development that serves as the basis for this litigation. Bieter was formed with a single objective and Klohs has been intimately involved in the attempt to achieve that objective. As Bieter's sole representative at meetings with potential tenants and with local officials, he likely possesses information that is possessed by no other. As the initial retainer agreement he entered into with Bieter indicates, it retained him "to provide advice and guidance regarding commercial and retail development

based upon [his] knowledge of commercial and retail business in the State of Minnesota," just as one would retain an outside accountant for her knowledge of, say, the proper accounting practices and taxation concerns of partnerships. There is no principled basis to distinguish Klohs's role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation. *See Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682; Sexton, *supra,* at 498. As we understand the record, he was in all relevant respects the functional equivalent of an employee. *See McCaugherty,* 132 F.R.D. at 239.

■ Applying the *Diversified* test to the facts before us presents a somewhat more difficult question, but we shall take it step-by-step, ever aware, as the respondents remind us, that the burden is on Bieter to show that the communications at issue meet all of the requirements. *See Diversified,* 572 F.2d at 609 (en banc). The first requirement is that the communication be made for the purpose of seeking legal advice. In applying this requirement in *Diversified,* we noted that when a matter is committed to a professional legal advisor, it is "prima facie committed for the sake of legal advice and [is], therefore, within the privilege absent a clear showing to the contrary." *Id.* at 610. As in that case, "no such showing [has been] made," *id.,* and, at least as far as the documents in question are concerned, the affidavit of counsel indicates that those documents "relate to this lawsuit or Bieter Company's related state court lawsuit." Levine Aff. ¶ 6. Although this is not as strong a statement as one might like,[8] given the presumption that the communication was made for the purpose

---

**8.** The affidavits are, as the magistrate noted in the hearing he held on this issue, "very carefully worded," "so carefully worded as to raise all kinds of eyebrows." Tr. at 26, 27 (Motion Hearing July 26, 1993). The statement that the documents are "related" to the lawsuit is certainly inadequate to qualify the documents for protection under the work-product doctrine. *See* Fed. R.Civ.P. 26(b)(3) (documents must be "prepared

in anticipation of litigation or for trial"); *see also* Tr. at 17–18 (Motion Hearing July 26, 1993) (court inquires where the affidavits provide that these documents were prepared in anticipation of litigation). Documents need not meet the same requirement to be protected by the attorney-client privilege, however. *See Diversified,* 572 F.2d at 611 n. 4 (en banc).

of seeking legal advice, we find that the first requirement is satisfied.[9]

The second requirement is that the person making the communication do so at the direction of his superior. Klohs tells us that "as a member of the [Bieter] development team," he "received direction from Ronald Cornwell, a principal of Bieter Company, as to [his] duties and responsibilities." Klohs Aff. ¶ 3. Cornwell tells us that Klohs's "involvement with counsel has been essential to the 35E/Diffley Center proposal and the prosecution of the state and federal court lawsuits." Cornwell Aff. ¶ 5. And both Cornwell and Klohs indicate that they have worked together on a daily basis since 1986. *Id.* ¶ 2; Klohs Aff. ¶ 6. Given these facts, it is reasonable to assume that Cornwell directed Klohs's communications with counsel.

The third requirement is that the superior request that the communication be made so that the client could secure legal advice. No amplification of this requirement appears in *Diversified*, but that is not particularly surprising in that it adds little to the first two requirements. If the communication was made for the purpose of seeking legal advice and it was done at the direction of the superior, it is reasonable to infer that, absent evidence to the contrary, the superior directed that the communication be made for the purpose of securing legal advice. Again, no contrary evidence has been presented.

The fourth requirement is that the subject matter of the communication be within the scope of the representative's duties. As discussed earlier, Klohs's duties were in many respects coterminous with the reason for the client's existence and with the scope of the transactions that led to this litigation. We have no difficulty finding that the subject

matter of the communications fell within his duties as a consultant to Bieter.

The fifth and final requirement is that the communication not be disseminated beyond those persons who, because of the structure of the client's operations, need to know its contents. All of the affidavits indicate that the communications in question were treated as confidential. As far as we can tell from the record, the communications were disseminated beyond no one other than Klohs and the principals of Bieter. The respondents would have us hold that dissemination to Klohs was not necessary, but such an argument is nonsensical. This requirement exists as an indication of the intent of the client and the attorney to keep the communication confidential. *See Weinstein's Evidence* ¶ 503(b)[04], at 503–69. Had the communications been disseminated to others who had no need to know, the respondents might well be correct. But to argue that communications to and from one whom we have held to be the functional equivalent of an employee of the client somehow lose their protected status by dissemination to the "employee" who is making these communications within the scope of his employment, at the direction of his superior and for the purpose of seeking legal advice, is absurd. Such a rule would short-circuit the entire test. Suffice it to say that the dissemination of a communication that otherwise satisfies the elements of the test put forth in *Diversified* to the "employee" whose communications are at issue does not destroy the privilege.

We hold, then, that on the basis of the record before us, the privilege applies to communications made between Klohs and Dorsey, and that the disclosure of otherwise privileged documents to Klohs in the course of his confidential communications with coun-

---

9. The respondents indicate that the record in this case "makes it evident that lawyers were involved in discussions regarding political, business, land use and other topics, as well as legal matters," and go on to argue that absent evidence that the communications were for the purpose of obtaining legal advice, it would be improper to hold the privilege applicable. Cliff Road Br. at 12 n. 6. This argument fails to take account of our holding in *Diversified* and our subsequent statements on that point. *See Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir.)

(stating that "legal advice concerning commercial transactions is often intimately intertwined with and difficult to distinguish from business advice" and holding the privilege applicable to communications that mix business and legal advice), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). The respondents do not direct our attention to any record evidence suggesting that these communications were not for the purpose of seeking legal advice, and absent any such evidence, the presumption applies.

sel did not destroy the privilege.[10] Klohs is, for purposes of the privilege, the functional equivalent of Bieter's employee, and the communications in question fell within the scope of his duties, were made at the behest of his superior, and were made for the purpose of seeking legal advice for Bieter.

## IV

■ Having determined that the privilege applies to communications made by Klohs to counsel on Bieter's behalf, we must yet address whether Bieter "has met the burden of showing that its right to the issuance of the writ is 'clear and indisputable.'" *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953) (quoting *United States ex rel. Bernardin v. Duell,* 172 U.S. 576, 582, 19 S.Ct. 286, 287, 43 L.Ed. 559 (1899)). Had the district court applied the correct legal standard but, in the course of applying the *Diversified* test, determined that the communications had not satisfied one or more of the five requirements, we believe that it would have committed reversible error, but that such error would probably not constitute a clear abuse of discretion. This is not the error that commands issuance of the writ today, however, for the district court's error was in its clear failure to apply the proper legal analysis.

Rather than apply the teachings of *Upjohn* and *Diversified* to this issue, the district court treated it as a question of disclosing confidential communications to third parties in the context of individual, rather than entity, clients. *See Bieter Co. v. Blomquist,* No. 3–89–Civ–759, slip op. at 7–8 (D.Minn. Sept. 20, 1993). The court then considered exceptions to the general rule that disclosure to third parties waives the privilege, citing two exceptions noted by the Third Circuit in *Westinghouse,* 951 F.2d at 1424, and concluded that none applied. At no point did the court discuss Supreme Court Standard 503, whether Klohs constituted a "representative of the client," or the requirements set out in *Diversified,*[11] and in so doing, it clearly failed to apply the proper analysis. Failure to consider the argument, as inartfully as it may have been made below, given the significance of the issues presented, constitutes adequate basis for issuance of the writ.

## V

We close with the reminder that our holding today merely inconveniences the respondents, and that it in no way prevents them from learning facts relevant to the dispute:

> Application of the attorney client privilege to communications such as those involved here ... puts the adversary in no worse

10. The respondents indicate that twenty-five documents are still in dispute. Cliff Road App. at 1–2. These documents have not, to the court's knowledge, been reviewed by the district court *in camera* and they have not been reviewed by this court. The descriptions of many of them indicate that they were written, for example, by a Dorsey attorney to Klohs. Several of the descriptions do not mention Klohs, however, and many of the names are unknown to the court. Should respondents wish to renew their motion to compel production of some of these documents under the standard announced today, the district court should give Bieter and Dorsey the opportunity to prove that each of the challenged documents would be protected if circulated to a client's employee with Klohs's knowledge of the subject matter about which legal advice was being sought. We note again, however, that Bieter has failed to carry its burden of showing that the documents were prepared in anticipation of litigation, thus precluding application of the work-product doctrine, *see supra* n. 8, so Bieter must produce any challenged document that is not found to fall within the attorney-client privilege.

11. Nor did the court discuss these issues at the motion hearing on this issue. The magistrate judge began by noting his conclusion that "the assertion of the attorney-client privilege with respect to all of these documents is likely to be overruled." Tr. at 4–5 (Motion Hearing July 26, 1993). He seemed convinced that the same test applies to determining the applicability of the attorney-client privilege as applies to determining the identity of a client for purposes of disqualifying counsel, an issue he had apparently addressed earlier in this litigation. *See id.* at 15–16. Consequently he focused his attention on the sole issue of whether or not Klohs was the client, *id.* at 49, and indicated that "[i]f the guy who is out there is not a client he can have as many expectations of confidentiality as he wants, but if he is not a client whatever he might tell the lawyer is not privileged as I understand the law." *Id.* at 29. In focusing almost exclusively on whether Klohs was the client, the court ignored the issue of whether he was a representative of the client within the meaning of Supreme Court Standard 503(b) and under the principles announced in *Upjohn* and *Diversified.*

position than if the communications had never taken place. The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney: "[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Upjohn,* 449 U.S. at 395–96, 101 S.Ct. at 685–86 (quoting *City of Philadelphia v. Westinghouse Elec. Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962)); *see Diversified,* 572 F.2d at 611 (en banc). We suspect that, given the scope of discovery we are led to believe has occurred in this case, the respondents have already learned whatever might be revealed were we to find the privilege inapplicable, but if not, it is simply due to their own failure to ask the proper questions. Although it would undoubtedly be more convenient for them if Klohs were to provide them transcripts of his discussions with counsel, " '[d]iscovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary.' " *Upjohn,* 449 U.S. at 396, 101 S.Ct. at 686 (quoting *Hickman v. Taylor,* 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947) (Jackson, J., concurring)).

We therefore grant Bieter's petition for a writ of mandamus and direct that the district court vacate its order holding the attorney-client privilege inapplicable to communications between Klohs, as Bieter's representative, and counsel, without prejudice to further motions compelling discovery consistent with this opinion. Each party shall bear its own costs.