# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 99-3199

———————

|  |  |
|---|---|
| In re: United States of America; Janet Reno, Attorney General; and Eric H. Holder, Jr., Deputy Attorney General, | Petition for a Writ of Mandamus. |
| Petitioners. | |

———————

Submitted: October 20, 1999
Filed: December 8, 1999

———————

Before McMILLIAN, BRIGHT, and MURPHY, Circuit Judges.

———————

MURPHY, Circuit Judge.

This petition for a writ of mandamus is related to a federal prosecution in the Eastern District of Arkansas in which the United States Attorney filed notices of intention to seek the death penalty against Chevie O'Brien Kehoe and Daniel Lewis Lee. Both defendants were charged with racketeering and murder in aid of racketeering and were subsequently found guilty by a jury. After a verdict of life imprisonment without release was returned for Kehoe, the United States Attorney unsuccessfully sought permission from the Department of Justice ("DOJ") to withdraw the death notice in Lee's case. The jury recommended that Lee be sentenced to death,

and he moved to set aside the death verdict. Lee sought discovery in support of the motion and subpoenaed Attorney General Janet Reno and Deputy Attorney General Eric Holder in connection with the procedures used in deciding not to withdraw the death notice. Petitioners Reno and Holder moved to quash the subpoenas, the district court denied their motion, and petitioners now seek a writ of mandamus.

I.

The Federal Death Penalty Act of 1994 provides procedures for federal capital cases. 18 U.S.C. § 3591(a) et seq. (Supp. II 1999). If the government decides to seek the death penalty in a federal criminal case, it must file and serve upon the defendant a notice of that intention at a "reasonable time" prior to trial. 18 U.S.C. § 3593(a). The district court conducts a separate sentencing hearing to determine whether the death penalty will be imposed in cases where a defendant is found guilty of a capital count. 18 U.S.C. § 3593(b). Special findings on any aggravating or mitigating factor are to be returned by the jury, or the court if it is the factfinder. 18 U.S.C. § 3593(d) The factfinder then makes the ultimate sentencing finding of death, life imprisonment without release, or some lesser sentence. 18 U.S.C. § 3593(e). If the recommendation is "death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly." 18 U.S.C. § 3594.

Shortly after the passage of the Federal Death Penalty Act, the Attorney General promulgated a death penalty protocol, now found in § 9-10.000 et seq. of the United States Attorney's Manual (the "Manual"). The protocol provides for centralized review of any death penalty decision made by attorneys acting on behalf of the United States. When a federal indictment charges a capital count, the prosecutor is to send to the DOJ Criminal Division a completed death penalty evaluation form describing the facts and evidence, the theory of liability, the federal interest in the case, and any other information relevant to the charging decision. Manual at § 9-10.040. This evaluation form is reviewed by the Attorney General's Review Committee on Capital Cases (the

"committee") whose members are appointed by the Attorney General. The committee presently consists of the Deputy Attorney General, the Assistant Attorney General of the Criminal Division, and several other DOJ officials. The Attorney General decides whether the government will seek the death penalty after receiving a recommendation from the committee. Id. A prosecutor who wishes to withdraw a previously filed death notice must notify DOJ and state the reasons for the request. The DOJ committee then reviews the request and makes a recommendation to the Attorney General, who decides whether the death notice will be withdrawn. Id. at § 9-10.090.

Respondent Daniel Lewis Lee and his co-defendant, Chevie O'Brien Kehoe, were charged with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and various other offenses. Prior to trial Paula Casey, the United States Attorney for the Eastern District of Arkansas, filed notices of intention to seek the death penalty against both defendants. Evidence at trial showed that they had committed numerous crimes to further the goals of a white supremacist organization, including the robbery and murder of a gun dealer, William Mueller; his wife, Nancy Mueller; and their eight year old daughter, Sarah Powell. Both defendants were found guilty on the three capital counts on May 4, 1999, and separate sentencing hearings were scheduled for each.

Before the sentencing verdict in Kehoe's case was returned, the district court asked the lead prosecutor whether that verdict would affect the government's charging decision in Lee's case. The prosecutor expressed some uncertainty about whether DOJ approval would be required, but he believed the government would not seek a death sentence against Lee if the jury did not recommend death for Kehoe. After the jury returned with a verdict of life without release for Kehoe, the court was informed that United States Attorney Casey wanted to withdraw the death notice in Lee's case but that it was not clear whether she had the authority to do so without DOJ approval. The court called a recess to allow Casey to contact the department.

Casey then spoke with Deputy Assistant Attorney General Kevin V. DiGregory, a member of the death penalty committee, who told her that decertification required DOJ approval and that she would have to speak with the committee. Because Attorney General Janet Reno was in a meeting at the White House, DiGregory referred the matter to Deputy Attorney General Eric Holder who convened the other members of the committee to meet with Casey in a telephone conference. At the end of the conference, Holder stated that the death notice would not be withdrawn and told Casey that she should proceed accordingly. She reported the government's position to the court, and Lee's penalty phase began the following morning. The jury returned with a verdict of death.

Lee moved under FED. R. CRIM. P. 33 and 35 to set aside the verdict, asserting that DOJ had not followed the protocol in the Manual requiring that the Attorney General make the final decision regarding the decertification of a death notice. He claimed that he had the right to have the protocol followed, relying on a series of Supreme Court cases that require administrative agencies to abide by their internal regulations when taking actions that affect individual rights. Lee also moved for the issuance of subpoenas to compel testimony by the Attorney General and her deputy. The motion was granted, and subpoenas were issued directing Reno and Holder to appear at a district court hearing on June 29, 1999. The subpoenas were not served, however, and counsel for the parties testified at the June 29 hearing about what had occurred in respect to Lee's penalty proceeding. The district court decided to amend the subpoenas to require appearances by Reno and Holder on July 29, but continued them pending its resolution of a motion by the government to quash the subpoenas.

In its motion to quash, the government argued that high government officials like the Attorney General and the Deputy Attorney General can only be compelled to testify under extraordinary circumstances not present in this case and that the Manual and its death penalty protocol have not created procedural or substantive rights enforceable by Lee. The government argued further that Deputy Attorney General Holder had

-4-

statutory authority to act in the Attorney General's absence under 28 U.S.C. § 508(a), the DOJ decision making process is protected from inquiry by the deliberative process and the work product privileges, and Lee failed to comply with regulations governing the release of DOJ material. 28 C.F.R. § 16.21 et seq. (the "Touhy" regulations). As a supplement to its motion, the government submitted the affidavit of DiGregory which stated that at the time Casey requested a decision on withdrawal of the death notice in Lee's case, the Attorney General was in a meeting at the White House and unavailable to decide the question, that Deputy Attorney General Holder convened the committee to meet with Casey, and that Holder then made the decision not to withdraw the death notice.

Lee urged the court to deny the motion to quash, arguing that he had a right to enforce the provisions of the Manual, but if not, the Manual should be disregarded and the local prosecutor's decision to decertify the death notice should be implemented. Lee claimed in addition that the testimony of Reno and Holder was necessary to determine whether Attorney General Reno was legally absent at the time that Holder made the decision not to withdraw the death notice in Lee's case. Finally, Lee argued that the deliberative process and work product privileges were inapplicable to the testimony he sought.

The district court denied the government's motion to quash. In its written opinion, the court suggested that the death penalty protocol contained in the Manual might be enforced by a criminal defendant under certain circumstances, rejected the privilege claims and the argument that Lee had failed to comply with the Touhy regulations, and decided that the sworn statements that Attorney General Reno had been unavailable and that Holder was authorized to act in her absence did not foreclose the need for discovery. The district court concluded that the DiGregory affidavit was insufficient to resolve questions of fact it considered relevant to Lee's motion to set

aside the jury verdict and that further discovery from Reno and Holder was required before it would address the merits of Lee's motion.[1]

Attorney General Reno and Deputy Attorney General Holder then filed a petition for a writ of mandamus, asking this court to intervene to protect them from the subpoenas issued in the district court.[2] They argue that the circumstances of this case do not permit the particular discovery sought against them as high government officials and that Lee's argument that he has a due process right to enforce the death penalty protocol has no merit. Lee continues to assert a right to obtain more discovery before the resolution of his motion to set aside the jury's death verdict.

The writ of mandamus is an "extraordinary writ and 'is not ordinarily available to a litigant to obtain appellate review of interlocutory discovery orders.'" In re Bieter, 16 F.3d 929, 931 (8th Cir. 1994) (quoting Diversified Indus., Inc. v. Meredith, 572

---

[1]The district court stated that additional discovery was required on the following issues:

> [T]he whereabouts of the Attorney General on May 10, 1999, and the extent of her knowledge of, or participation in, the Protocol [;] whether the Defendant had an adequate opportunity to be heard; whether a recommendation was in fact made by the committee; whether the recommendation was conveyed to the individual vested with 'final' authority; whether, if in fact the Attorney General did not participate, she was legally 'absent' on that date; whether she specifically authorized the Deputy Attorney General to act in her stead in this case; and whether, after the fact, the Attorney General has reviewed the procedures and the decision of the Deputy Attorney General and approves or disapproves of the procedures used and agrees with or disagrees with the decision of the Deputy Attorney General.

[2]The district court has stayed the subpoenas pending this court's decision on the petition.

F.2d 596, 599 (8th Cir. 1977)). Nonetheless, the writ is the appropriate remedy when there are "serious policy considerations . . . sufficiently compelling to require immediate appellate attention" and direct appeal cannot provide an adequate remedy. Id. (internal quotation marks and citation omitted).

II.

The need for controlling the use of subpoenas against high government officials was recognized by the Supreme Court in United States v. Morgan, 313 U.S. 409, 421-22 (1941). In that case involving a subpoena directed to the Secretary of Agriculture, the Court stated that regular examination of high officials concerning the reasons for their official actions would undermine the integrity of the administrative process. Id. at 422. Other courts have reasoned similarly. Because "[h]igh ranking government officials have greater duties and time constraints than other witnesses . . . [they] 'should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.'" In re United States (Kessler), 985 F.2d 510, 512 (11th Cir. 1993) (per curiam) (quoting Simplex Time Recorder Co. v. Secretary of Labor, 766 F.2d 575, 586 (D.C.Cir. 1985)). If other persons can provide the information sought, discovery will not be permitted against such an official. Id. at 513; see also In re FDIC, 58 F.3d 1055, 1062 (5th Cir. 1995) ("We think it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness."). Allegations that a high government official acted improperly are insufficient to justify the subpoena of that official unless the party seeking discovery provides compelling evidence of improper behavior and can show that he is entitled to relief as a result. See In re FDIC, 58 F.3d at 1062.

It is not disputed here that the Attorney General and the Deputy Attorney General are high government officials. Lee must therefore establish at a minimum that the Attorney General and the Deputy Attorney General possess information essential to his case which is not obtainable from another source. Kessler, 985 F.2d at 512-13;

see also In re FDIC, 58 F.3d at 1062. This means both that the discovery sought is relevant and necessary and that it cannot otherwise be obtained. Kessler, 985 F.2d at 512-13. Without establishing this foundation, "exceptional circumstances" cannot be shown sufficient to justify a subpoena. See id.

Petitioners argue that Lee has not established that no one else could provide the information he seeks from Reno and Holder and that the DiGregory affidavit provides all the facts Lee needs for the legal claim he is pursuing. Lee asserts that the district court found that only Reno and Holder can testify to "the transparency of the record; [] what Ms. Reno knew or did not know about the decision to move forward with Mr. Lee's penalty phase; whether Ms. Reno had issued standing orders that might permit the Deputy Attorney General to, contrary to protocol, make the final decision about Mr. Lee's penalty phase; and whether Ms. Reno was, in fact, legally 'unavailable' on May 10, 1999, so that Mr. Holder could act in her absence." He further suggests that Reno and Holder could have offered testimony by stipulation or affidavit, and that the rules protecting high government officials should be relaxed in this case.

Lee's counsel conceded at oral argument that he needed to establish only the following facts in order to provide a factual basis for his claim: that Reno did not participate in or approve the decision not to withdraw the death notice in his case, that Reno did not know of Casey's request to withdraw the notice, and that the death penalty protocol was not followed. The record as developed at the June 29 hearing and in the DiGregory affidavit contains sufficient evidence to establish each of these facts, none of which appears to be disputed by the government. Testimony by Reno and Holder is not necessary to establish a factual basis for Lee's attempt to overturn the jury's sentencing recommendation on the basis of noncompliance with the protocol. Lee has also not shown that there are no other sources for the information he seeks, and the suggestion that petitioners might supply evidence without actually appearing in Little Rock does not call for application of a different standard. See In re Office of

Inspector General, 933 F.2d 276, 278 (5th Cir. 1991) and United States Bd. of Parole v. Merhige, 487 F.2d 25, 29 (4th Cir. 1973).

In order to obtain discovery from high government officials a party must also show an entitlement to the relief sought in the case. See In re FDIC, 58 F.3d at 1062. Petitioners argue that the legal theory underlying the subpoenas is without merit and cannot support the discovery request. The district court found Lee's claim that he had enforceable rights arising from the death penalty protocol sufficiently meritorious to allow discovery to proceed, and Lee argues that cases holding that administrative agencies are bound by their own regulations show that he has rights he can assert under the death penalty protocol.

In United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266-68 (1954), the Supreme Court vacated a deportation order because of the violation of a procedural regulation, and the Accardi case has come to stand for the proposition that administrative agencies may not take action inconsistent with their internal regulations when it would affect individual rights. This doctrine has been applied in a variety of settings. See, e.g., Morton v. Ruiz, 415 U.S. 199, 235 (1974) (unpublished guidelines could not be given substantive effect because Bureau of Indian Affairs manual required that eligibility guidelines be published); Yellin v. United States, 374 U.S. 109, 121-22 (1963) (reversing contempt citation issued by Congress); and Service v. Dulles, 354 U.S. 363, 373 (1957) (vacating termination of government employees).

No case has ever held that the Accardi doctrine applies to the internal regulations of the DOJ. Courts have generally refrained from judicial review of asserted violations of DOJ policies or regulations because of the unique nature of prosecution and the "broad discretion" granted the Attorney General and federal prosecutors in their enforcement of the laws of the United States. United States v. Armstrong, 517 U.S. 456, 464 (1996) (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)). See United States v. McVeigh, 944 F. Supp. 1478, 1483-84 (D. Colo. 1996). Many cases

in this circuit and elsewhere have applied this principle in connection with the Petite policy, an internal DOJ policy that prohibits a federal prosecution 'if the alleged criminality was an ingredient of a previous state prosecution against that person'" unless "specifically authorized in advance by the Department of Justice itself, upon a finding that the prosecution will serve 'compelling interests of federal law enforcement.'" United States v. Basile, 109 F.3d 1304, 1308 (8th Cir. 1997) (quoting Thompson v. United States, 444 U.S. 248, 248  (1980) (per curiam)).  This court has held that this internal policy "confers  no substantive rights on the accused[,]"  United States v. Moore, 822 F.2d 35, 38 (8th Cir. 1987) (per curiam), and  its implementation by DOJ "cannot form the basis of a claim [by a defendant] that the prosecution was improper."  United States v. Lester, 992 F.2d 1304, 1308 (8th Cir. 1993).

The death penalty protocol contained in the Manual is an internal DOJ policy directing the exercise of prosecutorial discretion.  The Manual itself states that its content "provides only internal Department of Justice guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."  Id. at § 1-1.100.  Some courts have relied on this language in holding that the Manual does not create rights enforceable by criminal defendants.  See  United States v. Myers, 123 F.3d 350, 355-56 (6th Cir. 1997) (Manual creates no enforceable procedural or substantive rights); United States v. Goodwin, 57 F.3d 815, 818 (9th Cir. 1995) (same); see also United States v. Craveiro, 907 F.2d 260, 263-64 (1st Cir. 1990) (policy in DOJ Handbook on the Comprehensive Crime Control Act of 1984 did not create enforceable rights).

Courts that have addressed directly whether the death penalty protocol described in the Manual creates any substantive or procedural rights enforceable by a defendant have held almost uniformly that it does not.   Nichols v. Reno, 931 F. Supp. 748, 751 (D.Colo.), *aff'd*, 124 F.3d 1376 (10th Cir. 1997) (death penalty protocol does not create enforceable rights);  see also United States v. McVeigh, 944 F. Supp. 1478, 1483-84 (D.Colo. 1996) (same);  United States v. Feliciano, 998 F. Supp. 166, 169

(D.Conn.1998) (same);  United States v.Roman, 931 F. Supp. 960, 964 (D.R.I. 1996) (same); but see Walker v. Reno, 925 F. Supp. 124, 132 (N.D.N.Y. 1995) (failure to follow protocol might provide basis to "remand the matter to the Attorney General for reconsideration[.]").

The merits of the issue are not directly before us as to whether the death penalty protocol creates any right Lee can enforce, and we hold only that on the record before us at this time Lee has not made a sufficient showing of entitlement to relief to enable him to obtain the additional discovery he seeks.

### III.

Lee has not established extraordinary circumstances requiring the discovery sought from Attorney General Reno and Deputy Attorney General Holder.  Even though a writ of mandamus will generally not be available to obtain interlocutory review of a discovery order, petitioners have shown that in this matter there are significant policy issues requiring immediate attention and that direct appeal from the final order of the district court would not give them an adequate remedy.  See  In re Bieter, 16 F.3d 929, 931 (8th Cir. 1994).  The district court has yet to rule on Lee's motion to set aside the verdict, and to require petitioners to respond to the subpoenas and wait to raise their objections on direct appeal of the court's final order would deprive them of the protection to which they are legally entitled.  The petition is thus granted, and the matter is remanded to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.