**ENERGY CAPITAL CORP., as General Partner of Energy Capital Partners Limited Partnership, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–293 C.

United States Court of Federal Claims.

Jan. 11, 2000.

Michael S. Gardener, Boston, MA, R. Robert Popeo, Beth I.Z. Boland, Laurence A. Schoen, Boston, MA, of counsel, for plaintiff.

Mark. L. Josephs, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Jeffrey A. Belkin, Allison A. Page, of counsel, Carole W. Wilson, Angelo Aiosa, Kathleen Burtschi, Department of Housing and Urban Development, of counsel, for defendant.

**OPINION**

DAMICH, Judge.

On June 22, 1999, the Defendant filed a motion to compel that raised three discreet issues. With admirable professionalism, the parties expeditiously completed briefing the contentious legal issues to maintain the schedule set for this case. The Court, after hearing oral argument, ruled on the motion to compel on July 14, 1999. The ruling, however, did not explain the Court's decision. This opinion is intended to address the interesting issues raised in the motion to compel.

### I. Facts

Under a contract called the AHELP agreement, the Plaintiff agreed to provide loans for renovations to Housing and Urban Development (HUD) housing to make the apartments more fuel efficient. The Plaintiff expected that the loans would save the owners of the HUD-assisted housing a considerable amount of money (millions of dollars). The owners' savings would let them pay the financing for the loan.

The parties agree HUD terminated the contract following the publication of an article in The Wall Street Journal that wrongly stated HUD awarded the contract to the Plaintiff because of political donations to members of the Democratic party. The Plaintiff is suing for breach of contract and the Defendant has admitted this breach.

The remaining issue in dispute is the amount of damages to which the Plaintiff is entitled. The Plaintiff is pursuing two theories. Primarily, the Plaintiff is seeking "lost profits." The parties have represented that the Plaintiff will claim more than $10 million in lost profits. The Defendant argues that the claim for lost profits is too speculative. Alternatively, the Plaintiff wants to recover the costs it incurred in preparing to perform under the contract. The Plaintiff has presented a list of costs that totals approximately $1.3 million.

In pursuing discovery on facts related to damages, the Defendant issued several requests for documents. These documents can be grouped into three categories:[1] (1) bills

---

1. The motion to compel does not separate the first and second categories. The Plaintiff's opposition, however, recognizes this distinction. The Court believes it is analytically helpful to follow the Plaintiff's organization.

from the Plaintiff's attorneys; (2) documents related to whether the AHELP program was likely to be successful; and (3) documents provided by the Plaintiff's trial attorneys to expert witnesses who are expected to testify on behalf of the Plaintiff at trial. The Plaintiff objected to these requests for production. For categories one and two, the Plaintiff claimed that the attorney-client privilege made the documents exempt from discovery. For category three, the Plaintiff claimed that the work-product doctrine prevented the production of the documents.

The day after hearing oral argument, the Court announced its decision in an order. The Court required the attorneys' bills and documents given to the testifying expert witnesses to be produced. For the second category, the Court divided those documents into two groups. When the Plaintiff waived the attorney-client privilege by sharing the documents with third parties, the Court ordered their production. When the Plaintiff did not waive the privilege, then the Court denied the motion to compel. This opinion sets forth the basis for each of the Court's decisions.

## II. Bills Produced by Attorneys

### A. Introduction

Energy Capital retained several different law firms to assist it to perform the AHELP contract. For example, the AHELP program required several different legal documents such as the AHELP mortgage note, the AHELP mortgage loan agreement, UCC-1 financing statements, title insurance, an FHA Consent Agreement, and the Consent and Agreement of Prior Lender, etc. Energy Capital also required extensive negotiations not only with HUD, but also with Fannie Mae and its partners/subcontractors. The Plaintiff has claimed these expenses as an element of "cost" because the law firms' tasks were related to performing under the contract.[2]

The United States served requests for production of documents that show the involvement of certain law firms that worked for Energy Capital. These documents include billing records of their various law firms.[3]

Energy Capital interposed an objection to providing complete and unredacted bills based on "attorney-client privilege and the work-product doctrine." Energy Capital is willing to produce redacted bills.[4] The United States offers several reasons why the attorney-client privilege or the work-product doctrine should not prevent the production of relevant information.[5]

### B. Law Regarding Attorney–Client Privilege and Work–Product Doctrine

#### 1. Attorney-client privilege

■■■ The assertion of privileges is strictly construed because privileges impede full and free discovery of the truth. *Eureka Financial Corp. v. Hartford Accident & Indem. Co.*, 136 F.R.D. 179, 183 (E.D.Cal. 1991). The burden of establishing the attorney-client privilege rests upon the party claiming privilege. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The court in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950), enunciated the requirements necessary to assert the attorney-client privilege as follows:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose

**2.** Legal expenses incurred for litigating this action are not part of this discovery dispute.

**3.** Law firm bills total about $270,000.00.

**4.** The Plaintiff submitted some legal invoices with descriptive time summaries redacted. See Plaintiff's Ex. 11.

**5.** Although this opinion describes several arguments, the brief by the United States does not delineate these arguments separately.

of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

The attorney-client privilege is triggered only by a client's request for legal, as contrasted with business, advice and is "limited to communications made to attorneys solely for the purpose of the corporation seeking legal advice and its counsel rendering it." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir.1984). Thus, information does not become privileged simply because it came from counsel, and when documents or conversations are created pursuant to business matters, they must be disclosed. *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 137 (N.D.Ill. 1993).

*Cabot v. United States*, 35 Fed.Cl. 442, 444–45 (1996).

■■■■ The attorney-client privilege pertains to legal advice. Therefore, it does not protect either factual information or business advice. "[I]t is clear that when an attorney conveys to his clients facts acquired from other persons or sources, those facts are not privileged." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir.1995).

■■■■ "When a lawyer acts as a business or economic advisor, there is no special relationship to give rise to a privilege to protect his advice from disclosure." *Dep't of Economic Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 295, 300 (S.D.N.Y.1991), quoting *Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*, 111 F.R.D. 76, 80 (S.D.N.Y.1986). An attorney's work in drafting "by-laws, promissory notes, security agreements, incorporation documents, partnership documents and tax information" concerns business—not legal—matters and therefore is not privileged. *Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 227 (D.D.C.1995).

## 2. Work-product doctrine

The attorney work-product privilege attaches to documents prepared in anticipation of litigation for trial by a party or its representative. *Hickman v. Taylor*, 329 U.S. 495, 511–12, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947). "If the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated." *United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Emer.App.1985).

*Cabot v. United States*, 35 Fed.Cl. 442, 445 (1996).

■■■■ By definition, the work-product doctrine protects work performed in anticipation of litigation. See *Cabot v. United States, supra*, 35 Fed.Cl. at 445.

[T]he initial inquiry is whether, in light of the nature of the documents and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation ... The protection from disclosure offered by Rule 26(b)(3) requires a more immediate showing than the remote possibility of litigation.... Litigation must at least be a real possibility at the time of preparation or, in other words, the document must be prepared with an eye to some specific litigation.

*Occidental Chemical v. OHM Remediation Services*, 175 F.R.D. 431, 434 (W.D.N.Y.1997) (internal quotation marks and citations omitted).

Documents which do not refer to work product prepared by an attorney or other agent of a party to aid in forthcoming litigation, and which were generated in the ordinary course of business, are discoverable.... Accordingly, if a party or its attorney prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation.

*Id.* at 435 (internal quotation marks and citations omitted).

### C. Has the Plaintiff waived attorney-client privilege and work-product doctrine by claiming compensation for attorneys' fees?

#### 1. Law regarding "at issue"

█ In *Afro–Lecon, Inc. v. United States,* 820 F.2d 1198, 1204–05 (Fed.Cir. 1987), the Federal Circuit endorsed a test set forth in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975). The party has waived the *attorney client* privilege if:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information *at issue* by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Zenith Radio Corp. v. United States,* 764 F.2d 1577, 1579 (Fed.Cir.1985) (emphasis added), quoting *Hearn v. Rhay,* 68 F.R.D. at 581.

█ A party can also waive the protections of the *work product* privilege by placing the subject of the work product in issue. *Granite Partners v. Bear, Stearns & Co., Inc.,* 184 F.R.D. 49, 54–55 (S.D.N.Y.1999).

█ *Ideal Electronic Security Co. v. International Fidelity Ins. Co.,* 129 F.3d 143, 151–52 (D.C.Cir.1997), explains that when a party seeks attorneys' fees, that party has placed *all* bills from the attorneys "in issue." In *Ideal,* International Fidelity Ins. Co. (IFIC) was seeking attorneys' fees based on an indemnification agreement. IFIC produced redacted bills and the District Court awarded some attorneys' fees but refused to award any money for a redacted bill. *Id.* at 147.

The D.C. Circuit rejected this approach. IFIC "effectively waived its attorney-client privilege with regard to all communications going to the reasonableness of the fees claimed when it placed the purportedly privileged matters in dispute by claiming indem-

nification for the attorney's fees. . . . If IFIC [on remand] declines to disclose the redacted portions of the billing statements, then the entire claim for fees must be denied." *Id.* at 146. "As a practical matter, the reasonableness of any portion of the billing statement can only be determined by examining all billing statements pertaining to the legal services provided as a whole." *Id.* at 151.

Other cases take this approach. See, e.g., *Potomac Electric Power Co. v. California Union Ins. Co.,* 136 F.R.D. 1, 4–5 (D.D.C. 1990).

#### 2. Arguments

The Defendant argues that the *complete* billing record, including time descriptions, should be produced. The billing records are relevant because the Plaintiff is claiming the money it paid its attorneys in developing the AHELP program as an item of cost for which it is entitled to reimbursement. Further, the bills are not privileged because the Plaintiff has placed the amount of the bills "at issue." The Defendant is entitled to question whether the legal expenses were "reasonable." To present its defense, the United States needs to scrutinize the time devoted to each task.

In contrast, the Plaintiff argues that redacted bills are sufficient for the Defendant to respond to the claim for attorneys' fees. This argument attacks the Defendant's claim that the unredacted bills are "vital" as used in *Hearn v. Rhay* test. Moreover, the Plaintiff offered to provide a generalized summary of the legal services rendered.[6] The Plaintiff analogizes bills from a law firm to bills from another contractor. Most contractors do not describe their charges in minute detail, such as six-minute increments. Yet, the bills from the contractor are part of the damages if the bills are reasonable.

#### 3. Decision

The Court ordered the production of the complete, unredacted bills because they are the most complete documents. Law firms,

---

**6.** The government rejected this compromise because it believes it is entitled to the complete, unredacted billing statement.

which keep detailed time records, differ from other businesses, which do not keep such detailed records. While it would be overly burdensome to force another business to create more detailed records solely for the purpose of litigation, a law firm should not be excused from providing what it regularly keeps.

In general, courts have required a party seeking an award of attorneys' fees to present detailed, contemporaneous time records. See, e.g., *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Slimfold Mfg. Co. Inc. v. Kinkead Industries, Inc.*, 932 F.2d 1453, 1459 (Fed.Cir.1991); *Owen v. United States*, 861 F.2d 1273, 1275 (Fed.Cir.1988). Although these cases did not involve a party seeking attorneys' fees as an item of costs for breach of contract, the general principle guides the Court's decision. Accordingly, the Court ordered the production of whatever time records were available to the Plaintiff or under the Plaintiff's control.

## III. Has the Plaintiff waived attorney-client privilege doctrine by claiming compensation for lost profits?

### A. Introduction

Energy Capital claims that it is entitled to lost profits for breach of the AHELP contract. Energy Capital, through discovery, asserts that the AHELP program would have been entirely successful and the parties had already contemplated—if not actually agreed to—an expansion of the program.

The United States believes that the claim for lost profits is too speculative. Before HUD terminated the AHELP program, Energy Capital did not complete even one project. Thus, there is no record to show that the program would have succeeded. To support its position, the United States served requests for production of documents, including documents created by law firms working for it, in which Energy Capital and its partners/subcontractors discuss the riskiness of the AHELP program.

Energy Capital objects on the grounds of attorney-client privilege. The United States responds that Energy Capital waived the privilege either by placing these documents "at issue" or by destroying the confidential nature of the communications by sharing the communications with entities that were not the attorney's client. This decision examines these two arguments in the following sections.

### B. At issue

#### 1. Defendant's argument

■ The Defendant challenges the claim for lost profits. To do so, the Defendant needs "to analyze the structure of the AHELP program (both in its development and in the form at termination), the risks to, requirements of, and burdens on various entities which must have become involved for Energy Capital to profit at all, the size of the alleged market for these loans, and the potential for competition in making of these loans." Def. Motion, page 15. The Defendant speculates that the documents, which have been withheld,

> appear to contain vital information to our defense, including: reports of discussions among various parties (particularly HUD, Fannie Mae and Energy Capital) regarding the drafting of various agreements under AHELP in which various risks of the lending programs are undertaken by various parties ... discussions about market potential and size, as well as the general level of interest and enthusiasm of various parties at various stages of the AHELP program's development and initial implementation, ... and discussions internally within Energy Capital and with third parties about the best ways to structure the AHELP program to increase its likelihood of success.

The Defendant further argues that information about risks in the AHELP program is not available elsewhere. According to the United States, during depositions, representatives of Energy Capital denied that the AHELP program had any risks. See, Exhibit JJ at 60–63; Exhibit KK at 41; Exhibit LL at 94–95. In addition, according to the United States, the Energy Capital deponents had limited recollection of negotiation sessions and meetings. As some indication of

the riskiness of the AHELP's program, the Defendant points to the fact that Energy Capital and Fannie Mae did not complete the legal documentation necessary for the AHELP loans that Energy Capital would originate and sell to Fannie Mae. According to the Defendant, the extended negotiations show that the parties thought there were risks.[7]

### 2. Plaintiff's argument

The Plaintiff argues that the Defendant fails to meet the *Hearn* test. (See part II. C.1., above). The Plaintiff emphasizes that the party seeking to compel the disclosure of privileged documents must make a *"strong showing of need"* to breach the privilege. *Zenith Radio Corp. v. United States*, 764 F.2d at 1580 (Fed.Cir.1985) (emphasis added).

The Plaintiff attacks the Defendant's reasons for needing the information. First, Energy Capital represents that none of the documents concern the risks or likelihood of the success of the program. Second, Energy Capital states that it did not rely on the advice of counsel for justifying its claim for lost profits. Therefore, the advice of counsel is not "at issue." Third, the documents are not "vital" to the defense because the request is too speculative.

### 3. Decision

The Court found the Plaintiff's arguments, particularly the second argument, more persuasive. The advice of counsel about the risks, possible successes, and best way to structure the AHELP program is one step removed from the actual risks. "It is always possible that the client's motive or conduct was influenced by something his attorney told him, but compelling the production cannot be justified solely as a means to check the [client's] statements." *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408, 417 (D.Del.1992).

Therefore, the "at issue" exception does not apply to these documents. The Defendant, however, also asserted that the Plaintiff waived the attorney-client privilege for some documents by distributing them to third parties.

### C. Waiver of attorney-client privilege by sharing with third parties

### 1. Basic law about confidentiality of attorney-client communications.

 "The attorney-client privilege evaporates upon any voluntary disclosure of confidential information to a third party." *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir.1990). "The privilege can be waived by the client or prospective client only if the communication is later disclosed to a third party and the client either did not wish to keep the materials confidential or the client did not take adequate steps in the circumstances to prevent the disclosure of the privileged communication." *B.E. Meyers & Co., Inc. v. United States*, 41 Fed.Cl. 729, 731 (1998).

### 2. Parties' arguments

The United States argues that Energy Capital waived its privilege. Energy Capital's privilege log reveals that documents from Howard Cohen (presumably, an attorney for Energy Capital) were sent to people the Defendant identifies as working for Recapitalization Advisors, Housing Partners, Inc., or Summit Capitalization Advisors. The United States contends that such voluntary disclosure constitutes a waiver of the privilege.

Energy Capital asserts that it did not waive the privilege because "all of the third party contractors identified in Energy Capital's privilege log were acting as agents of Energy Capital in connection with AHELP." Plaintiff's Opposition to Defendant's Discovery Motion, page 16. Quoting *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir.1994), Energy Capital argues "it is inappropriate to distinguish between those on a client's payroll and those who are instead, and for whatever reason, employed as independent contractors."

---

7. The Defendant, however, does not explain why it cannot obtain information from Fannie Mae. If Fannie Mae was reluctant to agree to Energy Capital's proposals, then Fannie Mae should have evidence to support its reluctance.

The Court perceives two different questions. Does the law recognize an extension of the attorney-client privilege to include disclosures to third parties? If so, what showing does the party asserting the privilege make?

3. **As a legal question, does the law permit the client to share communications from an attorney with independent third parties while retaining the confidential nature of the communication?**

 a. **Relevant case law and scholarly treatment**

■ *Bieter* warrants detailed attention because it is a rare case in which a court has considered the precise issue before this court: whether the attorney-client privilege extends to include third party independent contractors who work for the client.[8] In *Bieter*, a partnership retained an independent contractor (Klohs) to assist the partnership in developing real estate. Klohs's sole responsibility was in regard to a particular parcel and that parcel was the focus of the litigation underlying the *Bieter* discovery dispute. *Id.* at 934. Klohs was extremely involved in the litigation. Sometimes, Klohs met with the partnership's attorney without a member of the partnership attending and sometimes Klohs wrote letters directly to the attorney without copying a member of the partnership.

In discussing whether the attorney-client privilege protected the communications between Klohs and the attorneys for the partnership, the Eight Circuit stated:

The crux of the matter, then, is whether an independent contractor can be a representative of the client for purposes of applying the attorney-client privilege.

Little has been written on this question. Bieter cites to a number of cases in which the presence of individuals other than the client at attorney-client conferences was held not to destroy the privilege, focusing primarily on the intent of the client to keep the communications confidential. These cases strike us as not quite on point. . . . The only way in which the privilege could apply . . . is if Klohs was Bieter's representative for the purpose of applying the attorney-client privilege.

*Id.* at 936.

Before answering whether Klohs was Bieter's representative, the Eight Circuit reviews relevant precedent about the attorney-client privilege, including *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). *See id.* at 935–938. In *Upjohn*, the Supreme Court recognized that a corporation was entitled to assert the attorney-client privilege and discussed who within the corporation was the "client." See *Upjohn Co. v. United States*, 449 U.S. at 389–91, 101 S.Ct. at 682–84. As part of its analysis, the Eighth Circuit describes a common situation involving an independent contractor:

[A]n accountant, who though an independent contractor, performs regular accounting services for a corporation over many years. As the accountant, he has an insider's knowledge of the corporation's operations that few people even on the corporation's payroll have. Assume he represents the corporation at an IRS audit. Finally, assume that a tax indictment issues against the corporation and that an attorney is retained. Clearly, the accountant has knowledge of extraordinary importance to the attorney's investigation of the tax matter. And, equally clearly, the logic of *Upjohn* commands that the mere fact that the accountant was not an employee of

---

8. In addition to *Bieter*, the Plaintiff offers *Scott Paper Co. v. United States*, 943 F.Supp. 489, 499 (E.D.Pa.), *aff'd*, 943 F.Supp. 501 (E.D.Pa.1996) as another example of a case that considered this issue. *Scott Paper* states "[i]n claims of attorney-client by an organization, . . . the privilege extends to those communications between the attorney and all *agents* or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication." (emphasis added).

The Court finds *Scott Paper* inapposite. The language about *agents* is clearly dicta because the court did not consider whether independent contractors were within the privilege. Instead, the court held that the proponent of the privilege failed to demonstrate that the documents were kept with the expectation of confidentiality. Therefore, the attorney-client privilege did not apply.

the corporation should not preclude application of the privilege. There is no reason to differentiate between an accountant-employee and a regularly retained outside accountant when both occupy the same extremely sensitive and continuing position as financial adviser, reviewer, and agent: both possess information of equal importance to the lawyer.

A literalistic extension of the privilege only to persons on the corporation's payroll would invariably prevent a corporation's attorney from engaging in a confidential discussion with a corporation's regular independent accountant, no matter how important the accountant's information would be to the attorney.

*Id.* at 937, quoting John E. Sexton, *A Post–Upjohn Consideration of the Corporate Attorney–Client Privilege,* 57 N.Y.U.L.Rev. 443, 498 (1982) [hereinafter Sexton].

In *Bieter,* the Eight Circuit held the attorney-client privilege "applies to communications made between Klohs and Dorsey [the law firm], and that the disclosure of otherwise privileged documents to Klohs in the course of his confidential communications with counsel did not destroy the privilege." *Id.* at 939–40.

Although *Bieter* states that its "research has uncovered only two analogous situations in the scholarship and the federal case law," *Id.* at 936; this court's research discovered additional authorities, which are collected in Paul R. Rice, *Attorney–Client Privilege in the United States* § 4:19 (1993).[9] This treatise states: "When, however, those third parties have an established working relationship with the corporate client that is similar to that of regular employees, they should be treated like regular employees [for purposes of the attorney-client privilege]." *Id.* at 4–68.

There is little justification for distinguishing between 'permanent' employees who communicate with counsel on matters that are within the scope of their employment, and 'temporary' employees (outside agents) who provide the same services to the corporation, often with the same conti-

nuity of employment, ... and whose communications are equally important to the legal services that counsel renders to the corporate client.

*Id.* at 4–70.

Rice proposes the following test taken from the same law review article cited in *Bieter*:

A corporate attorney-client privilege faithful to *Upjohn* would protect communications of those persons (otherwise qualifying) who, either when they are speaking or after they have acquired their information: (1) possess decision making responsibility regarding the matter about which legal help is sought, (2) are implicated in the chain of command relevant to the subject matter of the legal services, or (3) are personally responsible for or involved in the activity that might lead to liability for the corporation.

*Id.* at 4–71, quoting Sexton, *supra,* at 500. Sexton believes this test is not underinclusive because it "brings within the protection of the privilege an important group of corporate actors unprotected by other approaches; for example, independent contractors possessing a *special relationship* to *both* the corporation and the transaction giving rise to the need for legal services." Sexton, *supra,* at 500 (emphasis added).

A split decision of the Federal Circuit touches, slightly, this issue. Applying the law of the Second Circuit, *Dorf & Stanton Communications, Inc. v. Molson Breweries,* 100 F.3d 919 (Fed.Cir.1996), affirmed a district court decision that ordered the production of handwritten notes taken by members of a public relations firm. Molson filed a motion to compel documents created by employees of Dorf & Stanton, the public relations firm for Labatt's USA, Inc. (This motion to compel was part of a lawsuit, John Labatt, Ltd. v. Molson Breweries, concerning the use of the word "ice" in beer marketing.) Employees of Dorf & Stanton attended a meeting with attorneys for Labatt. *Id.* at 920. The notes include

9. The Federal Circuit has cited this treatise with approval. *Genentech v. United States Internat'l*

*Trade Comm'n,* 122 F.3d 1409, 1415 (Fed.Cir. 1997).

details of the issues in litigation, statements of Labatt's legal strategy in the litigation, legal advice concerning advertising use of the trademarks that are in litigation in view of the litigation positions, legal advice concerning public relations in view of the litigation positions, and other information concerning litigation issues as they relate to the advertising and public relations activities of Dorf & Stanton and Hill, Holiday on behalf of Labatt.

*Id.* at 927 (Newman, J., dissenting).

The District Court had ordered the production of these notes.

The documents are notes of personnel of the independent advertising agencies representing Plaintiffs made at a meeting scheduled to assist them in marketing and advertising Plaintiffs' product.... There has been no showing that the Third Parties were seeking legal advice at the meeting. Rather, it appears that Plaintiffs were briefing the personnel of the Third Parties so that the content of the advertising placed by the agencies would not undercut the theories expounded in the litigation. The documents themselves do not indicate either the seeking of legal advice or the confidentiality of their contents.

*John Labatt, Ltd. v. Molson Breweries,* 1995 WL 23603, at *1 (S.D.N.Y.1995).

The Federal Circuit affirmed this decision with little analysis. "Since we perceive no error in the determination that the privilege has been waived on the facts of this case, we cannot say that the district court abused its discretion." *Dorf & Stanton Communications, Inc. v. Molson Breweries,* 100 F.3d at 923.

In dissent, Judge Newman argued that the majority and the District Court failed to consider the agency relationship. "It is well established that communications between the lawyer and agents of the client, concerning the client's legal interests as necessary and reasonable to the agency function, do not destroy the privileged nature of such communications." *Id.* at 927 (Newman, J., dissenting). "Communications concerning the client's legal and litigation interests as relevant to the agency's function are no less privileged than if the exchanges were direct-

ly between attorney and client." *Id.* For both propositions, Judge Newman cited cases from the Second Circuit.

#### b. Decision

This court adopts the rule recognized in *Bieter* and advocated by Sexton. In appropriate circumstances, a person may share information received from its attorney with third parties and not waive the attorney-client privilege that would otherwise exempt that information from discovery.

The Court's ruling does not contradict the teachings of the Federal Circuit in *Dorf & Stanton Communications,* 100 F.3d at 919. The majority did not reject, as a matter of law, the possibility that an independent contractor could be treated as the client's agent. Instead, the majority found that the district court did not abuse its discretion when it found that the Plaintiff did not establish the privilege.

Having found that it is theoretically possible for the attorney-client privilege to be preserved despite the participation of third parties, the Court turns to the question of whether the Plaintiff has met the requirements.

4. **As a factual question, has the Plaintiff established the relationship between itself and the third parties to preserve the confidential nature of the communications between the Plaintiff and its attorneys?**

The party asserting the attorney-client privilege has the burden of proving the elements. *Cabot v. United States,* 35 Fed.Cl. at 444, citing *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The Defendant's reply brief brings out this argument as an alternative. It contends that the Plaintiff has failed to meet its burden.

Specifically, the Defendant argues that the Plaintiff has not shown that any of the third parties identified in the privilege log, Recapitalization Advisors (David Smith and Todd Trehubenko), Housing Partners, Inc. (Eleanor White or Marvin Siflinger) or Summit

Capitalization Advisors (Gerry Nanos), are the Plaintiff's agents.

██ A detailed factual showing is necessary to establish the relationship between the client and a third party that is sought to be included within the protection of the attorney-client privilege. In *In re Bieter Co.*, 16 F.3d at 929, the party claiming the privilege presented affidavits to establish the relationship. These affidavits were very detailed. *Id.* at 934 and 938–39. See also, *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238–41 (N.D.Cal.1990) (describing declarations made to establish facts on which the claim of attorney-client privilege was based).

██ The Plaintiff did not present any factual basis [10] for claiming that Recapitalization Advisors; Housing Partners, Inc.; and/or Summit Capitalization Advisors acted as the agent for Energy Capital. Extending the attorney-client privilege to include independent contractors who work for the client, while not unprecedented, is somewhat unusual. Not every independent contractor qualifies for this special protection as the authorities such as *Bieter* and the law review article by Dean Sexton make clear. The Court cannot decide whether the relationship between Energy Capital and any of its agents meet the requirements because the Plaintiff presented no facts.

Accordingly, the Court ruled that the Plaintiff failed to meet its burden to show that the documents shared with its agents are protected by the attorney-client privilege.[11] Accordingly, the Plaintiff was ordered to produce those documents.

10. Appendix H to the Rules of the Court of Federal Claims lists several ways to present factual matters before the court in a motion, one of which is to present an affidavit.

11. Energy Capital had two opportunities to present the factual predicate. First, Energy Capital could have included an affidavit with its memorandum in opposition to the motion to compel. This affidavit would have been appropriate because Energy Capital had the burden to establish the elements of its claim for privilege. Second, Energy Capital could have presented an affidavit at the oral argument. Although the better prac-

## IV. Materials given to expert witnesses

### A. Introduction

The parties have retained expert witnesses to testify [12] about damages. The parties agreed to produce expert witness reports and to have their experts submit to depositions. The Court entered an order on the parties' agreement.

The United States requested the production of all documents exchanged between the Plaintiff's experts and the Plaintiff's attorneys. Energy Capital objected because these documents include material protected by the work-product doctrine. This case presents another occurrence of the intersection between the work-product doctrine and the discovery of expert-related information.

### B. Work-product doctrine

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests.... Were such materials open to opposing counsel on mere demand, much of what is now put down in

tice is to include all factual matters in the briefing, the Court would have accepted an affidavit as late as oral argument because Energy Capital agreed to an expedited briefing schedule. Further, the Defendant's reply brief clearly warned Energy Capital that the factual predicate was an issue.

12. This opinion discusses discovery only with respect to *testifying* experts. The discovery of materials related to experts that only consult with the attorney raise separate issues that are beyond the scope of this opinion.

writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness, and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947).

▮ "The work product of the lawyer covers the 'written materials obtained or prepared by an adversary's counsel with an eye toward litigation." It includes "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs.'" *Bogosian v. Gulf Oil Corp.,* 738 F.2d 587, 592 (3rd Cir.1984) (quoting *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 394, 91 L.Ed. 451 (1947)). "Opinion work product includes the mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation." *Oneida, Ltd. v. United States,* 43 Fed.Cl. 611, 618 n. 13 (internal quotation marks omitted).

Both the rules of procedure for the Court of Federal Claims [13] and the Federal Rules of Civil Procedure [14] recognize the work-product doctrine. Accordingly, this court may be guided by decisions of the other federal courts interpreting Fed.R.Civ.Proc. 26(b)(3). *Wheeler v. United States,* 11 F.3d 156 (Fed. Cir.1993); *Knieper v. United States,* 38 Fed. Cl. at 128 (1997).

### C. Procedures for discovery of expert materials

The Court of Federal Claims provides for limited discovery of information about expert witnesses. See RCFC 26(a)(3).[15]

In contrast, the *current* version of the Federal Rules of Civil Procedure requires much more detail about discovery. The *previous* version, however, was identical to the Court of Federal Claims rule. Accordingly, the cases that interpret the version of Fed. R.Civ.Proc. 26(b)(3) that was effective before December 1993 are more relevant than cases interpreting the newer (and current) version of Fed.R.Civ.Proc.[16]

### D. Analogous cases

All cases of which this court is aware have required that the production of factual infor-

---

**13.** Subject to the provisions of subdivision (b)(3) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including that other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
RCFC 26(b)(2).

**14.** Fed.R.Civ.Proc. 26(b)(3) is substantively identical to RCFC 26(b)(2), set out in the preceding footnote.

**15.** *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision

(b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(3)(C) of this rule, concerning fees and expenses as the court may deem appropriate.
RCFC 26(a)(3).

**16.** The Defendant seems to overlook the differences between the versions of the Federal Rules and the Rules for the Court of Federal Claims. The Defendant criticizes the Plaintiff for citing to cases that are old and superceded by the 1993 amendment. This criticism is not warranted because the older cases remain valid because the Court of Federal Claims has not amended its rules.

mation given by an attorney to an expert must be produced. See, e.g., *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 595 (3rd Cir. 1984). In addition, courts also require the production of the information and opinion provided by an expert to the attorney. See, e.g., *Abruzzo v. United States*, 21 Cl.Ct. 351, 357 (1990). The more difficult issue is whether the party must produce documents that reveal "opinion" work product.

On this contested issue, the courts have reached a range of results.[17] For example, *Bogosian* upheld the work product doctrine and did not require the production of materials. In contrast, *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 392 (N.D.Cal.1991), found that the principle of liberal discovery was more important and therefore required the production of materials given to the expert.

### E. Decision

 Following established precedent, the Court ordered the production of factual information given by the attorney to the expert and reports created by the experts for the attorneys. The Court also ordered the production of documents that implicate the core work product.

In reaching this decision, the Court was guided primarily by the recent decision in *Oneida*, which summarizes many cases and considers the arguments on both sides. Like *Oneida*, this Court finds that the policy arguments favor the production of all materials given to experts. Complete disclosure promotes the discovery of the true source of the expert's opinions and the detection of any influence by the attorney in forming the opinion of the expert. In addition, the attorneys can minimize how much the other side learns of their opinion work product by monitoring what information is provided to the expert. If the expert does not have the attorney's opinion work product, then neither will the other side's attorney. Lastly, a clear

line is easier to administer and a predictable result helps the litigants plan their strategy.

Accordingly, the Court ordered the parties [18] to produce all documents given to their experts and all documents from their experts.

### V. Conclusion

The Court ordered the production of unredacted bills from all law firms for which Energy Capital has claimed as a cost. The Court declined to order the production of documents that relate to the riskiness of the AHELP program within the attorney-client privilege, except when Energy Capital waived the privilege by sharing the documents with third parties. Finally, the Court ordered the production of documents that counsel provided to testifying expert witnesses.

---

17. *Oneida, Ltd. v. United States,* 43 Fed.Cl. at 618–19, lists many more cases.

18. The Defendant agreed that if the Court required the Plaintiff to produce these documents, then it would produce them as well. The Defendant made this offer even though the Plaintiff did not file its own motion to compel.